1  Andrew K. Alper, (State Bar No. 088876)
   aalper@frandzel.com
2  FRANDZEL ROBINS BLOOM & CSATO, L.C.
   1000 Wilshire Boulevard, Nineteenth Floor
3  Los Angeles, California 90017-2427
   Telephone: (323) 852-1000
4  Facsimile: (323) 651-2577

5  Attorneys for Creditor and Third Party Claimant
   Dayco Funding Corporation

6

7

8              **UNITED STATES BANKRUPTCY COURT**

9       **CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION**

10  In re                                      CASE No. 2:16-bk-17549-ER

11  RONNIE DAVID YONA and CAROLINE             Chapter 7
    YONA,
12
                Debtor.
13
    _____
14  BANK OF AMERICA, N.A., etc.,               **NOTICE OF REMOVAL OF THIRD
                                               PARTY CLAIM OF DAYCO FUNDING
                Plaintiff,                     CORPORATION UNDER 28 U.S.C.
15                                             SECTION 1452 AND FEDERAL RULES
                v.                             OF BANKRUPTCY PROCEDURE 9027
16                                             (REMOVAL OF CLAIMS RELATED TO
    BRUCE TORKAN, etc., et al.,                CASES)**
17
                Defendants.                    **No Hearing Required**
18
    _____
19  And Related Cross-Actions

20  _____

21

22      TO THE CLERK OF THE ABOVE-ENTITLED COURT:

23      PLEASE TAKE NOTICE that Third Party Claimant, Dayco Funding Corporation, a

24  California corporation ("Dayco") hereby removes its Third Party Claim filed in the Los Angeles

25  Superior Court to the United States Bankruptcy Court, Central District of California, Los Angeles

26  Division, bankruptcy case number 2:16-bk-17549-ER with respect to the action filed below and

27  based on the facts set forth below:

28      1.      On or about September 13, 2011, an action was commenced in the Superior Court

2500116.1 | 033162-0076                        1

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

of the State of California, County of Los Angeles (Central District) entitled <u>Bank of America, etc.,</u>

<u>Plaintiff v. Bruce Torkan, et al., Defendants</u> and related cross-actions, Case number BC469496. A

copy of the Complaint is attached hereto as Exhibit A.

2.    Thereafter, Azriel, LLC, the successor in interest to Plaintiff Bank of America,

N.A., obtained a Judgment against, among other parties and entities, Ronnie Yona, Caroline Yona,

Ronnie Yona, as Trustee of the Yona Family Trust, Caroline Yona, Inc., and First Merchant

Services, Inc. on December 8, 2014 which is attached hereto as Exhibit B.

3.    On June 7, 2016, Ronnie Yona and Caroline Yona filed a joint voluntary Chapter 7

petition in the United States Bankruptcy Court for the Central District of California as Case

number 2:16-bk-17549-ER ("Yona Bankruptcy"). A true and correct copy of the petition is

attached hereto as Exhibit C.

4.    Thereafter, creditor Azriel, LLC, attempted to levy on assets of Caroline Yona, Inc.

A true and correct copy of levy instructions and levies are attached hereto as Exhibit D.

5.    On March 6, 2017, Third Party Claimant, Dayco, filed its Third Party Claim

contending that its lien was prior to and superior to any liens or levies of Azriel, LLC and it has

entitlement to the proceeds from any levies. A true and correct copy of the Third Party Claim is

attached hereto as Exhibit E.

6.    On or about February 24, 2017, the Chapter 7 Bankruptcy Trustee in the Yona

bankruptcy filed a Motion for Approval of Compromise with Debtors and Dayco Funding

Corporation including the Declaration of Wesley H. Avery and the Settlement Agreement. A true

and correct copy of the Trustee's Motion for Approval of Compromise with Debtors and Dayco

Funding Corporation; Declaration of Wesley H. Avery and Settlement Agreement is attached

hereto as Exhibit F. Also attached hereto as Exhibit G is a copy of the Order Approving the

Compromise entered on March 16, 2017, unopposed by Azriel, LLC.

7.    On or about March 15, 2017, Azriel, LLC served by mail and presumably filed

with the Court its Statement in Opposition to Dayco Funding Corporation's Third Party Claim. A

true and correct copy of the Statement of Opposition is attached hereto, marked Exhibit H and is

incorporated herein by this reference.

2500116.1 | 033162-0076

8.      In Azriel, LLC's Statement in Opposition to Dayco's Third Party Claim, Azriel, LLC contends that by virtue of the Trustee's settlement with the Debtors and Dayco, Dayco no longer has a claim or a lien and therefore the Third Party Claim must be overruled.  Not only does Dayco dispute Azriel, LLC's contention, but Dayco contends that by virtue of the settlement in the Bankruptcy Court with the Trustee all such claims for fraudulent transfers have been waived and released against Dayco and the Debtors. However, pursuant to the terms of the Settlement Agreement approved by the Bankruptcy Court, the Bankruptcy Court has exclusive jurisdiction over all matters involving the interpretation and enforcement of the terms of the Settlement Agreement wherein it provides in Paragraph 14—"The effectiveness of this Agreement is subject to and conditioned upon approval by the Bankruptcy Court in the Bankruptcy Case. **Any proceeding intended to interpret this Agreement, to enforce it or seek remedies for an alleged breach of this Agreement must be filed in the Bankruptcy Court.** In the event that the Bankruptcy Court is unavailable for such proceedings, they must be filed in the United States District Court for the Central District of California." (bold text for emphasis only). Therefore, all matters involving the Third Party Claim must be determined by the Bankruptcy Court because of the contentions made by Azriel, LLC in its Statement of Opposition to the Third Party Claim.

9.      Pursuant to 28 U.S.C. §1452 it is stated: "(a) A party may remove any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or civil action by a governmental unit to enforce such governmental unit's police or regulatory power to the District Court for the district where a civil action is pending, if such district court has jurisdiction over such claim or cause of action under section 1334 of this Title." Pursuant to 28 U.S.C. §1334 and 157, the district court, which also includes bankruptcy cases, has jurisdiction over this matter to interpret and enforce the terms of the Settlement Agreement.  This petition is filed within 30 days from the date of service of the Azriel, LLC's statement in opposition which invoked issues regarding the bankruptcy case which the Bankruptcy Court shall determine. Attached hereto as Exhibit I is the proposed Notice of Removal to the Los Angeles Superior Court which will be filed after the Court orders the removal.

10.      This matter is being removed because it is a core matter as defined in 28 U.S.C.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

NOTICE OF REMOVAL OF THIRD PARTY CLAIM OF DAYCO FUNDING CORPORATION UNDER 28
U.S.C. SECTION 1452 (REMOVAL OF CLAIMS RELATED TO CASES)

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

1    section 157 (b) (2)(A) and (H) and (K) and (O). Further, pursuant to 28 U.S.C. section 157 (c) (2)

2    this matter should be heard by the Bankruptcy Court.

3         11.    Dayco consents to the removal of this matter to the Bankruptcy Court and to the

4    entry of a final order or judgment on the Third Party Claim.

5         12.    Pursuant to Federal Rules of Bankruptcy Procedure 9027(a)(1) all such pleadings

6    filed in the State Court have been attached hereto for the Bankruptcy Court to make a

7    determination of the third Party Claim but attached as Exhibit J is a copy of the State Court docket

8    if the Bankruptcy Court desires any further documents filed with the State Court.

9         WHEREFORE, it is requested that the above matters involving the Third Party Claim of

10    Dayco now pending in the Superior Court of the State of California for the County of Los

11    Angeles, which is assigned Case number BC 469496 be removed from the Court to the United

12    States Bankruptcy Court for the Central District of California, Los Angeles Division, and heard as

13    part of Case number 2:16-bk-17549-ER.

14

15    DATED:  March 28, 2017               FRANDZEL ROBINS BLOOM & CSATO, L.C.

16

17                           By: _____

18                             ANDREW K. ALPER

19                             Attorneys for Third Party Claimant Dayco
                         Funding Corporation

20

21

22

23

24

25

26

27

28

NOTICE OF REMOVAL OF THIRD PARTY CLAIM OF DAYCO FUNDING CORPORATION UNDER 28
U.S.C. SECTION 1452 (REMOVAL OF CLAIMS RELATED TO CASES)

# Exhibit A

1   Randolph A. Bain, SBN 109527
    Law Offices of Randolph A. Bain
2   158 North Glassell Street, Suite 204
    Orange, California 92866-1407
3   Telephone:   (714)628-1171
    Facsimile:   (714)628-1172
4   E-mail:   bainrand@aol.com

5   Attorneys for Bank of America, N.A.

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

SEP 13 2011

John A. Clarke, Executive Officer/Clerk
BY _____, Deputy
Rozena Juliano

6

7

8        SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              FOR THE COUNTY OF LOS ANGELES

10                                         BC469496

11   Bank of America, N.A., a national          Case No. _____
     banking association,
12                                              COMPLAINT:
             Plaintiff,
13                                              (1) Breach of Guaranty
     vs.                                        (2) Money Lent
14
     Bruce Torkan;
15   Bruce Torkan, as Trustee of the CNA
     Royal Trust;
16   Bruce Torkan, M.D., a Medical
     Corporation;
17   Ronnie Yona;
     Caroline Yona;
18   Ronnie Yona, as Trustee of the Yona
     Family Trust;
19   Caroline Yona, Inc.;
     First Merchant Services, Inc.;
20   Does 1 through 50, inclusive,

21           Defendants.

22

23

24        Plaintiff, Bank of America, N.A. (the "Bank"), alleges:

25

26              GENERAL ALLEGATIONS

27   1.    The Bank is a national banking association, organized and existing under the

28   laws of the United States of America.

1

c::ave.j8.com                         EXHIBIT   A        COMPLAINT

5

2.   Defendant Bruce Torkan is an individual residing in the County of Los Angeles, State of California.

3.   Defendant Bruce Torkan, as Trustee of the CNA Royal Trust, is the duly appointed trustee of the CNA Royal Trust.

4.   Defendant Bruce Torkan, M.D., a Medical Corporation, is a corporation having its principal office in the County of Los Angeles, State of California.

5.   Defendant Ronnie Yona is an individual residing in the County of Los Angeles, State of California.

6.   Defendant Caroline Yona is an individual residing in the County of Los Angeles, State of California.

7.   Defendant Ronnie Yona, as Trustee of the Yona Family Trust, is the duly appointed trustee of the Yona Family Trust.

8.   Defendant Caroline Yona, Inc., is a corporation having its principal office in the County of Los Angeles, State of California.

9.   Defendant First Merchant Services, Inc., is a corporation having its principal office in the County of Los Angeles, State of California.

10.  Defendants Does 1 through 50, inclusive, are sued herein under fictitious names, their true names and capacities, whether individual, corporate, associate or otherwise, being presently unknown to the Bank. The Bank will seek leave to amend this complaint to designate the true names and capacities of Defendants Does 1 through 50, inclusive, when the same have been ascertained. The Bank is informed and believes, and thereon alleges, that Defendants Does 1 through 50, inclusive, and each of them, were agents or employees of the named Defendants, and each of them, or are otherwise responsible for all of the acts herein alleged. The actions by Defendants, and each of them, as herein alleged, were duly ratified by Defendants, and each of them, with each Defendant acting as an agent of the other and within the course and scope of such agency.

11.  On or about July 2, 2009, the Bank and Avenue J8, LLC ("Avenue J8"), entered into a written Loan Agreement of the same date (the "Loan Agreement"), pursuant

2

COMPLAINT

c:\ave.j8.com

6

1  to which the Bank loaned to Avenue J8 the principal sum of $2,800,000.00. The Loan

2  Agreement provides that default shall occur if, *inter alia*, Avenue J8 fails to make any

3  payment under the Loan Agreement when due. The Loan Agreement further provides that

4  upon default by Avenue J8, the Bank may, without prior notice, declare the entire unpaid

5  balance under the Loan Agreement to be immediately due and payable. A true and correct

6  copy of the Loan Agreement (with account number partially redacted) is attached hereto as

7  Exhibit "A" and incorporated herein.

8      12.   On or about July 17, 2009, the Bank and Avenue J8 entered into an

9  Amendment No. 1 to Loan Agreement, whereby the parties amended some terms of the Loan

10  Agreement, but did not amend the terms described in paragraph 11 above. A true and correct

11  copy of Amendment No. 1 to Loan Agreement is attached hereto as Exhibit "B" and

12  incorporated herein. The Loan Agreement and Amendment No. 1 to Loan Agreement shall

13  hereafter be referred to collectively as the "Loan Agreement."

14      13.   The Bank has performed all covenants, conditions and promises required on

15  its part under the Loan Agreement.

16      14.   Avenue J8 defaulted under the Loan Agreement by, *inter alia*, failing to make

17  the payment under the Loan Agreement that fell due on March 15, 2011, and by failing to

18  make any subsequent payments that fell due under the Loan Agreement. The Bank thereupon

19  exercised its option to declare the entire unpaid balance under the Loan Agreement to be

20  immediately due and payable.

21      15.   As of September 12, 2011, there was due, owing and unpaid by Avenue J8,

22  under the Loan Agreement, the principal sum of $2,579,082.92, accrued interest in the

23  additional sum of $83,295.16, and late fees in the additional sum of $5,372.94.

24  ////

25  ////

26  ////

27  ////

28  ////

3

c:\ave.j8.com

## FIRST CAUSE OF ACTION

(Breach of Continuing and Unconditional Guaranty

Against Bruce Torkan and Does 1 through 50)

16.    The Bank realleges and incorporates by reference each allegation contained in paragraphs 1 through 15 above, as though the same were fully set forth at this point.

17.    On or about July 2, 2009, for valuable consideration, Bruce Torkan executed and delivered to the Bank a Continuing and Unconditional Guaranty of the same date ("Guaranty No. 1"), pursuant to which he guaranteed, *inter alia*, all of Avenue J8's obligations under the Loan Agreement. A true and correct copy of Guaranty No. 1 is attached hereto as Exhibit "C" and incorporated herein.

18.    On or about July 2, 2009, the Bank accepted Guaranty No. 1 and, in reliance thereon, extended credit to Avenue J8 under agreements including, but not limited to, the Loan Agreement.

19.    Although demands have been made upon Bruce Torkan for performance under Guaranty No. 1, he has failed and refused to perform his obligation to pay the indebtedness of Avenue J8 under the Loan Agreement. As such, Bruce Torkan has breached Guaranty No. 1 and, as of September 12, 2011, there was due, owing and unpaid under that guaranty the principal sum of $2,579,082.92, accrued interest in the additional sum of $83,295.16, and late fees in the additional sum of $5,372.94. Additional interest and other lawful charges will be established according to proof at trial.

20.    Guaranty No. 1 provides that Bruce Torkan shall pay the reasonable attorney's fees and all other costs and expenses that may be incurred in the enforcement of that guaranty. Due to Bruce Torkan's breach of Guaranty No. 1, the Bank has employed the Law Offices of Randolph A. Bain to collect the sums due under that guaranty and to file and prosecute this action on the Bank's behalf. The Bank, therefore, is entitled to its reasonable attorney's fees and costs of collection.

////

4

## SECOND CAUSE OF ACTION

(Breach of Continuing and Unconditional Guaranty Against Bruce Torkan,
as Trustee of the CNA Royal Trust, and Does 1 through 50)

21. The Bank realleges and incorporates by reference each allegation contained in paragraphs 1 through 15 above, as though the same were fully set forth at this point.

22. On or about July 2, 2009, for valuable consideration, Bruce Torkan, as Trustee of the CNA Royal Trust (the "CNA Royal Trust"), executed and delivered to the Bank a Continuing and Unconditional Guaranty of the same date ("Guaranty No. 2"), pursuant to which the CNA Royal Trust guaranteed, *inter alia*, all of Avenue J8's obligations under the Loan Agreement. A true and correct copy of Guaranty No. 2 is attached hereto as Exhibit "D" and incorporated herein.

23. On or about July 2, 2009, the Bank accepted Guaranty No. 2 and, in reliance thereon, extended credit to Avenue J8 under agreements including, but not limited to, the Loan Agreement.

24. Although demands have been made upon the CNA Royal Trust for performance under Guaranty No. 2, it has failed and refused to perform its obligation to pay the indebtedness of Avenue J8 under the Loan Agreement. As such, the CNA Royal Trust has breached Guaranty No. 2 and, as of September 12, 2011, there was due, owing and unpaid under that guaranty the principal sum of $2,579,082.92, accrued interest in the additional sum of $83,295.16, and late fees in the additional sum of $5,372.94. Additional interest and other lawful charges will be established according to proof at trial.

25. Guaranty No. 2 provides that the CNA Royal Trust shall pay the reasonable attorney's fees and all other costs and expenses that may be incurred in the enforcement of that guaranty. Due to the CNA Royal Trust's breach of Guaranty No. 2, the Bank has employed the Law Offices of Randolph A. Bain to collect the sums due under that guaranty and to file and prosecute this action on the Bank's behalf. The Bank, therefore, is entitled to its reasonable attorney's fees and costs of collection.

5

## THIRD CAUSE OF ACTION

(Breach of Continuing and Unconditional Guaranty Against

Bruce Torkan, M.D., a Medical Corporation, and Does 1 through 50)

26.    The Bank realleges and incorporates by reference each allegation contained in paragraphs 1 through 15 above, as though the same were fully set forth at this point.

27.    On or about July 2, 2009, for valuable consideration, Bruce Torkan, M.D., a Medical Corporation ("Torkan, M.D."), executed and delivered to the Bank a Continuing and Unconditional Guaranty of the same date ("Guaranty No. 3"), pursuant to which it guaranteed, *inter alia*, all of Avenue J8's obligations under the Loan Agreement. A true and correct copy of Guaranty No. 3 is attached hereto as Exhibit "E" and incorporated herein.

28.    On or about July 2, 2009, the Bank accepted Guaranty No. 3 and, in reliance thereon, extended credit to Avenue J8 under agreements including, but not limited to, the Loan Agreement.

29.    Although demands have been made upon Torkan, M.D. for performance under Guaranty No. 3, it has failed and refused to perform its obligation to pay the indebtedness of Avenue J8 under the Loan Agreement. As such, Torkan, M.D. has breached Guaranty No. 3 and, as of September 12, 2011, there was due, owing and unpaid under that guaranty the principal sum of $2,579,082.92, accrued interest in the additional sum of $83,295.16, and late fees in the additional sum of $5,372.94. Additional interest and other lawful charges will be established according to proof at trial.

30.    Guaranty No. 3 provides that Torkan, M.D. shall pay the reasonable attorney's fees and all other costs and expenses that may be incurred in the enforcement of that guaranty. Due to Torkan, M.D.'s breach of Guaranty No. 3, the Bank has employed the Law Offices of Randolph A. Bain to collect the sums due under that guaranty and to file and prosecute this action on the Bank's behalf. The Bank, therefore, is entitled to its reasonable attorney's fees and costs of collection.

*////*

6

## FOURTH CAUSE OF ACTION

(Breach of Continuing and Unconditional Guaranty

Against Ronnie Yona and Does 1 through 50)

31.    The Bank realleges and incorporates by reference each allegation contained in paragraphs 1 through 15 above, as though the same were fully set forth at this point.

32.    On or about July 2, 2009, for valuable consideration, Ronnie Yona executed and delivered to the Bank a Continuing and Unconditional Guaranty of the same date ("Guaranty No. 4"), pursuant to which he guaranteed, *inter alia*, all of Avenue J8's obligations under the Loan Agreement. A true and correct copy of Guaranty No. 4 is attached hereto as Exhibit "F" and incorporated herein.

33.    On or about July 2, 2009, the Bank accepted Guaranty No. 4 and, in reliance thereon, extended credit to Avenue J8 under agreements including, but not limited to, the Loan Agreement.

34.    Although demands have been made upon Ronnie Yona for performance under Guaranty No. 4, he has failed and refused to perform his obligation to pay the indebtedness of Avenue J8 under the Loan Agreement. As such, Ronnie Yona has breached Guaranty No. 4 and, as of September 12, 2011, there was due, owing and unpaid under that guaranty the principal sum of $2,579,082.92, accrued interest in the additional sum of $83,295.16, and late fees in the additional sum of $5,372.94. Additional interest and other lawful charges will be established according to proof at trial.

35.    Guaranty No. 4 provides that Ronnie Yona shall pay the reasonable attorney's fees and all other costs and expenses that may be incurred in the enforcement of that guaranty. Due to Ronnie Yona's breach of Guaranty No. 4, the Bank has employed the Law Offices of Randolph A. Bain to collect the sums due under that guaranty and to file and prosecute this action on the Bank's behalf. The Bank, therefore, is entitled to its reasonable attorney's fees and costs of collection.

*////*

7

c:\ave.j8.com

## FIFTH CAUSE OF ACTION

(Breach of Continuing and Unconditional Guaranty

Against Caroline Yona and Does 1 through 50)

36.   The Bank realleges and incorporates by reference each allegation contained in paragraphs 1 through 15 above, as though the same were fully set forth at this point.

37.   On or about July 2, 2009, for valuable consideration, Caroline Yona executed and delivered to the Bank a Continuing and Unconditional Guaranty of the same date ("Guaranty No. 5"), pursuant to which she guaranteed, *inter alia*, all of Avenue J8's obligations under the Loan Agreement. A true and correct copy of Guaranty No. 5 is attached hereto as Exhibit "G" and incorporated herein.

38.   On or about July 2, 2009, the Bank accepted Guaranty No. 5 and, in reliance thereon, extended credit to Avenue J8 under agreements including, but not limited to, the Loan Agreement.

39.   Although demands have been made upon Caroline Yona for performance under Guaranty No. 5, she has failed and refused to perform her obligation to pay the indebtedness of Avenue J8 under the Loan Agreement. As such, Caroline Yona has breached Guaranty No. 5 and, as of September 12, 2011, there was due, owing and unpaid under that guaranty the principal sum of $2,579,082.92, accrued interest in the additional sum of $83,295.16, and late fees in the additional sum of $5,372.94. Additional interest and other lawful charges will be established according to proof at trial.

40.   Guaranty No. 5 provides that Caroline Yona shall pay the reasonable attorney's fees and all other costs and expenses that may be incurred in the enforcement of that guaranty. Due to Caroline Yona's breach of Guaranty No. 5, the Bank has employed the Law Offices of Randolph A. Bain to collect the sums due under that guaranty and to file and prosecute this action on the Bank's behalf. The Bank, therefore, is entitled to its reasonable attorney's fees and costs of collection.

///

8

## SIXTH CAUSE OF ACTION

(Breach of Continuing and Unconditional Guaranty Against Ronnie Yona,

as Trustee of the Yona Family Trust, and Does 1 through 50)

41.    The Bank realleges and incorporates by reference each allegation contained in paragraphs 1 through 15 above, as though the same were fully set forth at this point.

42.    On or about July 2, 2009, for valuable consideration, Ronnie Yona, as Trustee of the Yona Family Trust (the "Yona Family Trust"), executed and delivered to the Bank a Continuing and Unconditional Guaranty of the same date ("Guaranty No. 6"), pursuant to which the Yona Family Trust guaranteed, *inter alia*, all of Avenue J8's obligations under the Loan Agreement. A true and correct copy of Guaranty No. 6 is attached hereto as Exhibit "H" and incorporated herein.

43.    On or about July 2, 2009, the Bank accepted Guaranty No. 6 and, in reliance thereon, extended credit to Avenue J8 under agreements including, but not limited to, the Loan Agreement.

44.    Although demands have been made upon the Yona Family Trust for performance under Guaranty No. 6, it has failed and refused to perform its obligation to pay the indebtedness of Avenue J8 under the Loan Agreement. As such, the Yona Family Trust has breached Guaranty No. 6 and, as of September 12, 2011, there was due, owing and unpaid under that guaranty the principal sum of $2,579,082.92, accrued interest in the additional sum of $83,295.16, and late fees in the additional sum of $5,372.94. Additional interest and other lawful charges will be established according to proof at trial.

45.    Guaranty No. 6 provides that the Yona Family Trust shall pay the reasonable attorney's fees and all other costs and expenses that may be incurred in the enforcement of that guaranty. Due to the Yona Family Trust's breach of Guaranty No. 6, the Bank has employed the Law Offices of Randolph A. Bain to collect the sums due under that guaranty and to file and prosecute this action on the Bank's behalf. The Bank, therefore, is entitled to its reasonable attorney's fees and costs of collection.

9

## SEVENTH CAUSE OF ACTION

(Breach of Continuing and Unconditional Guaranty

Against Caroline Yona, Inc., and Does 1 through 50)

46.    The Bank realleges and incorporates by reference each allegation contained in paragraphs 1 through 15 above, as though the same were fully set forth at this point.

47.    On or about July 2, 2009, for valuable consideration, Caroline Yona, Inc. ("Yona, Inc.") executed and delivered to the Bank a Continuing and Unconditional Guaranty of the same date ("Guaranty No. 7"), pursuant to which it guaranteed, *inter alia*, all of Avenue J8's obligations under the Loan Agreement.  A true and correct copy of Guaranty No. 7 is attached hereto as Exhibit "I" and incorporated herein.

48.    On or about July 2, 2009, the Bank accepted Guaranty No. 7 and, in reliance thereon, extended credit to Avenue J8 under agreements including, but not limited to, the Loan Agreement.

49.    Although demands have been made upon Yona, Inc. for performance under Guaranty No. 7, it has failed and refused to perform its obligation to pay the indebtedness of Avenue J8 under the Loan Agreement. As such, Yona, Inc. has breached Guaranty No. 7 and, as of September 12, 2011, there was due, owing and unpaid under that guaranty the principal sum of $2,579,082.92, accrued interest in the additional sum of $83,295.16, and late fees in the additional sum of $5,372.94.  Additional interest and other lawful charges will be established according to proof at trial.

50.    Guaranty No. 7 provides that Yona, Inc. shall pay the reasonable attorney's fees and all other costs and expenses that may be incurred in the enforcement of that guaranty. Due to Yona, Inc.'s breach of Guaranty No. 7, the Bank has employed the Law Offices of Randolph A. Bain to collect the sums due under that guaranty and to file and prosecute this action on the Bank's behalf. The Bank, therefore, is entitled to its reasonable attorney's fees and costs of collection.

///

10

COMPLAINT

14

### EIGHTH CAUSE OF ACTION

(Breach of Continuing and Unconditional Guaranty Against
First Merchant Services, Inc., and Does 1 through 50)

51.   The Bank realleges and incorporates by reference each allegation contained in paragraphs 1 through 15 above, as though the same were fully set forth at this point.

52.   On or about July 2, 2009, for valuable consideration, First Merchant Services, Inc. ("First Merchant") executed and delivered to the Bank a Continuing and Unconditional Guaranty of the same date ("Guaranty No. 8"), pursuant to which it guaranteed, *inter alia*, all of Avenue J8's obligations under the Loan Agreement.  A true and correct copy of Guaranty No. 8 is attached hereto as Exhibit "J" and incorporated herein.

53.   On or about July 2, 2009, the Bank accepted Guaranty No. 8 and, in reliance thereon, extended credit to Avenue J8 under agreements including, but not limited to, the Loan Agreement.

54.   Although demands have been made upon First Merchant for performance under Guaranty No. 8, it has failed and refused to perform its obligation to pay the indebtedness of Avenue J8 under the Loan Agreement. As such, First Merchant has breached Guaranty No. 8 and, as of September 12, 2011, there was due, owing and unpaid under that guaranty the principal sum of $2,579,082.92, accrued interest in the additional sum of $83,295.16, and late fees in the additional sum of $5,372.94.  Additional interest and other lawful charges will be established according to proof at trial.

55.   Guaranty No. 8 provides that First Merchant shall pay the reasonable attorney's fees and all other costs and expenses that may be incurred in the enforcement of that guaranty. Due to First Merchant's breach of Guaranty No. 8, the Bank has employed the Law Offices of Randolph A. Bain to collect the sums due under that guaranty and to file and prosecute this action on the Bank's behalf. The Bank, therefore, is entitled to its reasonable attorney's fees and costs of collection.

////

11

## NINTH CAUSE OF ACTION

### (Money Lent Against All Defendants)

56.    The Bank realleges and incorporates by reference each allegation contained in paragraphs 1 through 55 above, as though the same were fully set forth at this point.

57.    Within the last four years, Defendants, and each of them, became indebted to the Bank in the sum of $2,579,082.92 lent by the Bank to Defendants and each of them, at their request.

58.    Although payment has been demanded, neither the whole nor any part of the above sum has been paid.

59.    As of September 12, 2011, there was due, owing and unpaid to the Bank by Defendants, and each of them, the principal sum of $2,579,082.92, accrued interest in the additional sum of $83,295.16, and late fees in the additional sum of $5,372.94. Additional interest and other lawful charges will be established according to proof at trial.

## PRAYER

WHEREFORE, the Bank prays for judgment as follows:

## ON ALL CAUSES OF ACTION

1.    For the principal sum of $2,579,082.92, the additional sum of $83,295.16 in accrued interest through September 12, 2011, the additional sum of $5,372.94 in late fees through September 12, 2011, and additional interest and other lawful charges, according to proof at trial;

2.    For the Bank's reasonable attorney's fees;

3.    For costs of suit incurred herein;

////
////
////

12

COMPLAINT

16

4.    For such further legal and equitable relief as this Court deems proper.

Dated:  September 12, 2011           Law Offices of Randolph A. Bain

                                    By: _____
                                        Randolph A. Bain
                                        Attorneys for Bank of America, N.A.

13

18

**Bank of America** 

# Loan Agreement

Date of Agreement  July 2, 2009

| Principal Amount: | $2,800,000.00 | Account Number: | ●●●●2132 |
|---|---|---|---|

**Introduction.** This Agreement dated and effective as of July 2, 2009, is entered into between (the "Borrower") and Bank of America, N.A. (the "Bank").  The Borrower agrees to the following terms and conditions:

**1.    LOAN**

**1.1    Loan Amount.** The Bank agrees to provide a term loan to the Borrower in the amount of Two Million Eight Hundred Thousand and 00/100 Dollars ($2,800,000.00) (the "Commitment").

**1.2    Availability Period.** The loan is available in one disbursement from the Bank between the date of this Agreement and August 15, 2009, unless the Borrower is in default.

**1.3    Repayment Terms.**

(a)    The Borrower will pay interest on August 15, 2009, and then on the same day of each month thereafter until payment in full of any principal outstanding under this Agreement.

(b)    The Borrower will repay principal in equal installments of Eleven Thousand Six Hundred Sixty-Six and 65/100 Dollars ($11,666.65) beginning on August 15, 2009, and on the same day of each month thereafter, and ending on July 15, 2009 (the "Repayment Period").  In any event, on the last day of the Repayment Period, the Borrower will repay the remaining principal balance plus any interest then due.

(c)    The Borrower may prepay principal in full or in part at any time.  The prepayment will be applied to the most remote payment of principal due under this Agreement.  Each prepayment, whether voluntary, by reason of acceleration or otherwise, will be accompanied by the amount of accrued interest on the amount prepaid, and a prepayment fee.  The prepayment fee will be the sum of the fees calculated separately for each Prepaid Installment, as follows:

(a)    The Bank will first determine the amount of interest which would have accrued each month for the Prepaid Installment had it remained outstanding until the Original Payment Date, using the Initial Money Market Funds Rate.

(b)    The Bank will then subtract from each monthly interest amount determined in (a), above, the amount of interest which would accrue for that Prepaid Installment if it were reinvested from the date of prepayment through the Original Payment Date, using the Treasury Rate.

(c)    If (a) minus (b) for the Prepaid Installment is greater than zero, the Bank will calculate the present value of the monthly differences to the date of prepayment by the rate used in (b) above.  The sum of the present values is the prepayment fee for that Prepaid Installment.

(d)    The following definitions will apply to the calculation of the prepayment fee:

"Initial Money Market Funds Rate" means the fixed interest rate per annum, determined solely by the Bank as of the first day of the Interest Period, as the rate at which the Bank would be able to borrow funds in the Money Market for the duration of the Interest Period in the amount of the prepaid principal and with a term, interest payment frequency, and principal repayment schedule equal to the prepaid principal.

"Interest Period" means the period during which the interest rate applicable to prepaid principal is fixed and not subject to change.

AFS Loan Agreement                                              · 1 ·

EXHIBIT  A

19

"Money Market" means one or more wholesale rate markets available to the Bank, including the LIBOR, Eurodollar, and SWAP rate markets as applicable and available, or such other appropriate Money Market as determined by the Bank in its sole discretion.

"Original Payment Dates" mean the dates on which the prepaid principal would have been paid if there had been no prepayment. If a portion of the principal would have been paid later than the end of the Interest Period in effect at the time of prepayment, then the Original Payment Date for that portion will be the last day of the Interest Period.

"Prepaid Installment" means the amount of the prepaid principal which would have been paid on a single Original Payment Date.

"Treasury Rate" means the interest rate yield for U.S. Government Treasury Securities which the Bank determines could be obtained by reinvesting a specified Prepaid Installment in such securities for a period of time approximating the period starting on the date of the prepayment and ending on the Original Payment Date.

The Bank may adjust the Initial Money Market Funds Rate and the Treasury Rate to reflect the compounding, accrual basis, or other costs of the prepaid amount. The rates shall include adjustments for reserve requirements, federal deposit insurance, and any other similar adjustment which the Bank deems appropriate. Each of the rates is the Bank's estimate only, and the Bank is under no obligation to actually purchase or match funds for any transaction or reinvest any prepayment. The rates are not fixed by or related in any way to any rate the Bank quotes or pays for deposits accepted through its branch system. The rates will be based on information from either the Telerate or Reuters information services, The Wall Street Journal, or other information sources the Bank deems appropriate.

**1.4    Interest Rate.**

(a)    The interest rate is a rate per year equal to the BBA LIBOR Adjusted Periodically Rate  plus 3.25 percentage point(s).

(b)    The interest rate will be adjusted on the 15th of every month (the "Adjustment Date") and remain fixed until the next Adjustment Date. If the Adjustment Date in any particular month would otherwise fall on a day that is not a banking day then, at the Bank's option, the Adjustment Date for that particular month will be the first banking day immediately following thereafter.

(c)    The BBA LIBOR Rate (Adjusted Periodically) is a rate of interest equal to the rate per annum equal to the British Bankers Association LIBOR Rate ("BBA LIBOR"), as published by Reuters (or other commercially available source providing quotations of BBA LIBOR as selected by the Bank from time to time) as determined for each Adjustment Date at approximately 11:00 a.m. London time two (2) London Banking Days prior to the Adjustment Date, for U.S. Dollar deposits (for delivery on the first day of such interest period) with a term of one month, as adjusted from time to time in the Bank's sole discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs. If such rate is not available at such time for any reason, then the rate for that interest period will be determined by such alternate method as reasonably selected by the Bank. A "London Banking Day" is a day on which banks in London are open for business and dealing in offshore dollars.

**2.    FEES AND EXPENSES**

**2.1    Fees.**

(a)    Waiver Fee. If the Bank, at its discretion, agrees to waive or amend any terms of this Agreement, the Borrower will, at the Bank's option, pay the Bank a fee for each waiver or amendment in an amount advised by the Bank at the time the Borrower requests the waiver or amendment. Nothing in this paragraph shall imply that the Bank is obligated to agree to any waiver or amendment requested by the Borrower. The Bank may impose additional requirements as a condition to any waiver or amendment.

(b)    Late Fee. To the extent permitted by law, the Borrower agrees to pay a late fee in an amount not to exceed four percent (4%) of any payment that is more than fifteen (15) days late. The imposition and payment of a late fee shall not constitute a waiver of the Bank's rights with respect to the default.

AFS Loan Agreement

20

g /



**2.2   Expenses.** The Borrower agrees to immediately repay the Bank for expenses that include, but are not limited to, filing, recording and search fees, appraisal fees, title report fees, documentation fees, and all fees and taxes required by law in connection with providing the credit. See disbursement and fee statement

**2.3   Reimbursement Costs.** The Borrower agrees to reimburse the Bank for the cost of periodic field examinations of Borrower's books, records and collateral, and appraisals of the collateral, at such intervals as the Bank may reasonably require. The actions described in this paragraph may be performed by employees of the Bank or by independent appraisers.

**3.   COLLATERAL**

**3.1.   Real Property – Parcel #1.**

(a)   The Borrower's obligations to the Bank under this Agreement will be secured by a lien covering the following real property owned by the Borrower:

43944 15th Street West<br>
Lancaster, CA 93535

**4.   DISBURSEMENTS, PAYMENTS AND COSTS**

**4.1   Disbursements and Payments**

(a)   Each payment by the Borrower will be made in U.S. Dollars and immediately available funds by debit to a deposit account, as described in this Agreement or otherwise authorized by the Borrower. For payments not made by direct debit, payments will be made by mail to the address shown on the Borrower's statement or at one of the Bank's banking centers in the United States, or by such other method as may be permitted by the Bank.

(b)   The Bank may honor instructions for advances or repayments given by the Borrower (if an individual), or by any one of the individuals authorized to sign loan agreements on behalf of the Borrower, or any other individual designated by any one of such authorized signers (each an "Authorized Individual").

(c)   For any payment under this Agreement made by debit to a deposit account, the Borrower will maintain sufficient immediately available funds in the deposit account to cover each debit. If there are insufficient immediately available funds in the deposit account on the date the Bank enters any such debit authorized by this Agreement, the Bank may reverse the debit.

(d)   Each disbursement by the Bank and each payment by the Borrower will be evidenced by records kept by the Bank. In addition, the Bank may, at its discretion, require the Borrower to sign one or more promissory notes.

(e)   Prior to the date each payment of principal and interest and any fees from the Borrower becomes due (the "Due Date"), the Bank will mail to the Borrower a statement of the amounts that will be due on that Due Date (the "Billed Amount"). The calculations in the bill will be made on the assumption that no new extensions of credit or payments will be made between the date of the billing statement and the Due Date, and that there will be no changes in the applicable interest rate. If the Billed Amount differs from the actual amount due on the Due Date (the "Accrued Amount"), the discrepancy will be treated as follows:

(i)   If the Billed Amount is less than the Accrued Amount, the Billed Amount for the following Due Date will be increased by the amount of the discrepancy. The Borrower will not be in default by reason of any such discrepancy.

(ii)   If the Billed Amount is more than the Accrued Amount, the Billed Amount for the following Due Date will be decreased by the amount of the discrepancy.

Regardless of any such discrepancy, interest will continue to accrue based on the actual amount of principal outstanding without compounding. The Bank will not pay the Borrower interest on any overpayment.

92



**4.2   Telephone Authorization.**

(a)   The Bank may honor telephone instructions for advances or repayments given, or purported to be given, by any one of the Authorized Individuals.

(b)   Advances will be deposited in and repayments will be withdrawn from account number CA-02452-76821 owned by the Borrower, or such other of the Borrower's accounts with the Bank as designated in writing by the Borrower.

(c)   The Borrower will indemnify and hold the Bank harmless from all liability, loss, and costs in connection with any act resulting from telephone instructions the Bank reasonably believes are made by any Authorized Individual. This paragraph will survive this Agreement's termination, and will benefit the Bank and its officers, employees, and agents.

**4.3   Direct Debit.**

(a)   The Borrower agrees that on the Due Date the Bank will debit the Billed Amount from deposit account number CA-02452-76821 owned by the Borrower, or such other of the Borrower's accounts with the Bank as designated in writing by the Borrower (the "Designated Account").

(b)   The Borrower may terminate this direct debit arrangement at any time by sending written notice to the Bank. If the Borrower terminates this arrangement, then the principal amount outstanding under this Agreement will at the option of the Bank bear interest at a rate per annum which is one (1.0) percentage point higher than the rate of interest otherwise provided under this Agreement and the amount of each payment will be increased accordingly.

**4.4   Banking Days.** Unless otherwise provided in this Agreement, a banking day is a day other than a Saturday, Sunday or other day on which commercial banks are authorized to close, or are in fact closed, in the state where the Bank's lending office is located, and, if such day relates to amounts bearing interest at an offshore rate (if any), means any such day on which dealings in dollar deposits are conducted among banks in the offshore dollar interbank market. All payments and disbursements which would be due on a day which is not a banking day will be due on the next banking day. All payments received on a day which is not a banking day will be applied to the credit on the next banking day.

**4.5   Interest Calculation.** Except as otherwise stated in this Agreement, all interest and fees, if any, will be computed on the basis of a 360-day year and the actual number of days elapsed. This results in more interest or a higher fee than if a 365-day year is used. Installments of principal which are not paid when due under this Agreement shall continue to bear interest until paid.

**4.6   Default Rate.** Upon the occurrence of any default or after maturity or after judgment has been rendered on any obligation under this Agreement, all amounts outstanding under this Agreement, including any interest, fees, or costs which are not paid when due, will, at the option of the Bank bear interest at a rate which is 6.0 percentage point(s) higher than the rate of interest otherwise provided under this Agreement. This may result in compounding of interest. This will not constitute a waiver of any default.

**5.   CONDITIONS**

Before the Bank is required to extend any credit to the Borrower under this Agreement, it must receive any documents and other items it may reasonably require, in form and content acceptable to the Bank, including any items specifically listed below.

**5.1   Authorizations.** If the Borrower or any guarantor is anything other than a natural person, evidence that the execution, delivery and performance by the Borrower and/or such guarantor of this Agreement and any instrument or agreement required under this Agreement have been duly authorized.

**5.2   Governing Documents.** If required by the Bank, a copy of the Borrower's organizational documents.

**5.3   Guaranties.** Guaranties signed by Bruce Torkan, M.D., A Medical Corporation ("Bruce Torkan, M.D., A Medical Corporation"), Bruce Torkan ("Bruce Torkan"), Ronnie Yona ("Ronnie Yona"), Caroline Yona ("Caroline Yona"), First Merchant Services Inc ("First Merchant Services Inc "), Caroline Yona, Inc ("Caroline Yona, Inc."), The CNA Royal Trust ("The CNA Royal Trust"), Yona Living Trust ("Yona Living Trust").



**5.4** **Perfection and Evidence of Priority.** Evidence that the security interests and liens in favor of the Bank are valid, enforceable, properly perfected in a manner acceptable to the Bank and prior to all others' rights and interests, except those the Bank consents to in writing. All title documents for motor vehicles which are part of the collateral must show the Bank's interest.

**5.5** **Payment of Fees.** Payment of all fees, expenses and other amounts due and owing to the Bank. If any fee is not paid in cash, the Bank may, in its discretion, treat the fee as a principal advance under this Agreement or deduct the fee from the loan proceeds.

**5.6** **Deed of Trust.** Signed and acknowledged original deed of trust, as required by the Bank, encumbering the real property collateral.

**5.7** **Title Insurance.** An ALTA lender's title insurance policy (on a form acceptable to the Bank and from a title company acceptable to the Bank), for at least Two Million Eight Hundred Thousand and 00/100 Dollars ($2,800,000.00), insuring the Bank's interest in the real property collateral, with only such exceptions as may be approved by the Bank and together with such endorsements as the Bank may require.

**5.8** **Environmental Information.** A completed Bank form Environmental Questionnaire.

**6.** **REPRESENTATIONS AND WARRANTIES**

When the Borrower signs this Agreement, and until the Bank is repaid in full, the Borrower makes the following representations and warranties. Each request for an extension of credit constitutes a renewal of these representations and warranties as of the date of the request:

**6.1** **Formation.** If the Borrower is anything other than a natural person, it is duly formed and existing under the laws of the state or other jurisdiction where organized.

**6.2** **Authorization.** This Agreement, and any instrument or agreement required hereunder, are within the Borrower's powers, have been duly authorized, and do not conflict with any of its organizational papers.

**6.3** **Good Standing.** In each state in which the Borrower does business, it is properly licensed, in good standing, and, where required, in compliance with fictitious name statutes.

**6.4** **Financial Information.** All financial and other information that has been or will be supplied to the Bank is sufficiently complete to give the Bank accurate knowledge of the Borrower's (and any guarantor's) financial condition, including all material contingent liabilities. Since the date of the most recent financial statement provided to the Bank, there has been no material adverse change in the business condition (financial or otherwise), operations, properties or prospects of the Borrower (or any guarantor). If the Borrower is comprised of the trustees of a trust, the foregoing representations shall also pertain to the trustor(s) of the trust.

**6.5** **Lawsuits.** There is no lawsuit, tax claim or other dispute pending or threatened against the Borrower which, if lost, would impair the Borrower's financial condition or ability to repay the loan, except as have been disclosed in writing to the Bank.

**6.6** **Other Obligations.** The Borrower is not in default on any obligation for borrowed money, any purchase money obligation or any other material lease, commitment, contract, instrument or obligation, except as have been disclosed in writing to the Bank.

**6.7** **Tax Matters.** The Borrower has no knowledge of any pending assessments or adjustments of its income tax for any year and all taxes due have been paid, except as have been disclosed in writing to the Bank.

**6.8** **No Event of Default.** There is no event which is, or with notice or lapse of time or both would be, a default under this Agreement.

**6.9** **Collateral.** All collateral required in this Agreement is owned by the grantor of the security interest free of any title defects or any liens or interests of others, except those which have been approved by the Bank in writing.

**7.** **COVENANTS**

AFS Loan Agreement

- 5 -

24

The Borrower agrees, so long as credit is available under this Agreement and until the Bank is repaid in full:

**7.1 Use of Proceeds.** To use the proceeds of the credit only for business purposes.

**7.2 Financial Information.** To provide the following financial information and statements in form and content acceptable to the Bank, and such additional information as requested by the Bank from time to time. The Bank reserves the right, upon written notice to the Borrower, to require the Borrower to deliver financial information and statements to the Bank more frequently than otherwise provided below, and to use such additional information and statements to measure any applicable financial covenants in this Agreement.

(a) Within 150 days of Borrower's fiscal year end:

    (i) A properly completed personal financial statement of Bruce Torkan, Ronnie Yona and Caroline Yona on the Bank's form with all questions fully answered and all schedules completed in their entirety, including all requested income/expense information, contingent liabilities disclosure; provided that, if the party providing the financial information uses his/her own automated financial statement, they may supplement the statement with supporting schedules, certifications or other details so that all information requested on the Bank's financial statement form is provided in lieu of using such form.

    (ii) Copies of the federal income tax return of the Borrower, Bruce Torkan, M.D., A Medical Corporation, Bruce Torkan, Ronnie Yona, Caroline Yona, First Merchant Services Inc. and Caroline Yona, Inc. and, if requested by the Bank, copies of any extensions of the filing date.

(b) Each financial statement required above must be accompanied by a certificate substantially in the form of the Compliance Certificate required by the Bank, signed by the party submitting the information or, if such party is a business entity, an authorized financial officer of the party. The Compliance Certificate shall state whether there existed as of the date of such financial statements, and whether there exists as of the date of the certificate, any event of default under this Agreement and, if any such default exists, specifying the nature thereof and the action the party is taking and proposes to take with respect thereto.

**7.3 Debt Service Coverage Ratio.** Avenue J8, LLC to maintain on a consolidated basis a Debt service Coverage Ratio of at least 1.25:1.0.

"Debt Service Coverage Ratio" means the ratio of Cash Flow to the sum of the current portion of long-term debt and the current portion of capitalized lease obligations, plus interest expense on all obligations.

"Cash Flow" is defined as (a) net income, after income tax, (b) less income or plus loss from discontinued operations and extraordinary items, (c) plus depreciation, depletion, and amortization, (d) plus interest expense on all obligations, and (e) minus dividends, withdrawals, and other distributions. This ratio will be calculated at the end of each reporting period for which the Bank requires financial statements, using the results of the twelve-month period ending with that reporting period. The current portion of long-term liabilities will be measured as of the date twelve (12) months prior to the current financial statement.

**7.4 Other Debts.** Not to have outstanding or incur any direct or contingent liabilities or lease obligations (other than those to the Bank), or become liable for the liabilities of others, without the Bank's written consent. This does not prohibit:

(a) Acquiring goods, supplies, or merchandise on normal trade credit.

(b) Liabilities, lines of credit and leases in existence on the date of this Agreement disclosed in writing to the Bank.

(c) If the Borrower is a natural person, additional debts of the Borrower as an individual for consumer purposes.

**7.5 Other Liens.** Not to create, assume, or allow any security interest or lien (including judicial liens) on property the Borrower now or later owns, except:

(a) Liens and security interests in favor of the Bank.

(b) Liens for taxes not yet due.

(c) Liens outstanding on the date of this Agreement disclosed in writing to the Bank.

AFS Loan Agreement

- 6 -

25

**7.6    Maintenance of Assets.**

(a)    Not to sell, assign, lease, transfer or otherwise dispose of any part of the Borrower's business or the Borrower's assets except in the ordinary course of the Borrower's business.

(b)    Not to sell, assign, lease, transfer or otherwise dispose of any assets for less than fair market value, or enter into any agreement to do so.

(c)    Not to enter into any sale and leaseback agreement covering any of its fixed assets.

(d)    To maintain and preserve all rights, privileges, and franchises the Borrower now has.

(e)    To make any repairs, renewals, or replacements to keep the Borrower's properties in good working condition.

**7.7    Loans.** Not to make any loans, advances or other extensions of credit to any individual or entity except for extensions of credit in the nature of accounts receivable or notes receivable arising from the sale or lease of goods or services in the ordinary course of business to non-affiliated entities.

**7.8    Change of Management.** Not to make any substantial change in the present executive or management personnel of the Borrower.

**7.9    Change of Ownership.** If the Borrower is anything other than a natural person, not to cause, permit, or suffer any change in capital ownership such that there is a material change, as determined by the Bank in its sole discretion, in the direct or indirect capital ownership of the Borrower.

**7.10    Additional Negative Covenants.** Not to, without the Bank's written consent:

(a)    Enter into any consolidation, merger, or other combination, or become a partner in a partnership, a member of a joint venture, or a member of a limited liability company.

(b)    Acquire or purchase a business or its assets.

(c)    Engage in any business activities substantially different from the Borrower's present business.

(d)    Liquidate or dissolve the Borrower's business.

**7.11    Notices to Bank.** To promptly notify the Bank in writing of:

(a)    Any event of default under this Agreement, or any event which, with notice or lapse of time or both, would constitute an event of default.

(b)    Any change in the Borrower's name, legal structure, principal residence (for an individual), state of registration (for a registered entity), place of business, or chief executive office if the Borrower has more than one place of business.

**7.12    Insurance**

(a)    General Business Insurance.  To maintain insurance as is usual for the business it is in.

(b)    Insurance Covering Collateral.  To maintain all risk property damage insurance policies (including without limitation windstorm coverage, and hurricane coverage as applicable) covering the tangible property comprising the collateral. Each insurance policy must be for the full replacement cost of the collateral and include a replacement cost endorsement.  The insurance must be issued by an insurance company acceptable to the Bank and must include a lender's loss payable endorsement in favor of the Bank in a form acceptable to the Bank.

(c)    Evidence of Insurance.  Upon the request of the Bank, to deliver to the Bank a copy of each insurance policy, or, if permitted by the Bank, a certificate of insurance listing all insurance in force.

**7.13    Compliance with Laws.** To comply with the laws (including any fictitious or trade name statute), regulations, and orders of any government body with authority over the Borrower's business. The Bank shall have no obligation to make

- 7 -

AFS Loan Agreement

26

any advance to the Borrower except in compliance with all applicable laws and regulations and the Borrower shall fully cooperate with the Bank in complying with all such applicable laws and regulations.

**7.14   Books and Records.** To maintain adequate books and records.

**7.15   Audits.** To allow the Bank and its agents to inspect the Borrower's properties and examine, audit, and make copies of books and records at any reasonable time. If any of the Borrower's properties, books or records are in the possession of a third party, the Borrower authorizes that third party to permit the Bank or its agents to have access to perform inspections or audits and to respond to the Bank's requests for information concerning such properties, books and records.

**7.16   Perfection of Liens.** To help the Bank perfect and protect its security interests and liens, and reimburse it for related costs it incurs to protect its security interests and liens.

**7.17   Cooperation.** To take any action reasonably requested by the Bank to carry out the intent of this Agreement.

**7.18   Bank as Principal Depository.** To maintain the Bank as its principal depository bank, including for the maintenance of business, cash management, operating and administrative deposit accounts.

**7.19   Flood and Other Insurance.** If any improved real property collateral is located in a designated flood hazard area, or becomes located in a designated flood hazard area after the date of this Agreement as a result of any re-mapping of flood insurance maps by the Federal Emergency Management Agency, the Borrower will be required to maintain flood insurance on the real property and on any tangible personal property collateral located on the real property. In addition, the Borrower shall maintain such other insurance as the Bank may require to comply with the Bank's regular requirements and practices in similar transactions, which may include earthquake insurance and insurance covering acts of terrorism.

**7.20   Inspections and Appraisals of Real Property.** To allow the Bank and its agents to visit the real property collateral at any reasonable time for the purpose of inspecting the real property and conducting appraisals, and deliver to the Bank any financial or other information concerning the real property as the Bank may request.

**7.21   Use or Leasing of the Real Property Collateral.**

(a)      To cause Bruce Torkan, M.D. A Medical Corporation, an entity affiliated with the Borrower (the "Affiliate"), to occupy the real property collateral for the conduct of its regular business. The Affiliate will not change its intended use of the real property without the Bank's prior written approval. If the real property is leased to the Affiliate, the lease will be fully subordinated to the Bank's lien. All terms, covenants, representations, and provisions of this Agreement which pertain or apply to the Borrower will pertain or apply to Affiliate in addition to, or in lieu of, the Borrower, as the context may require.

**7.22   Indemnity Regarding Use of Real Property.** To indemnify, defend with counsel acceptable to the Bank, and hold the Bank harmless from and against all liabilities, claims, actions, damages, costs and expenses (including all legal fees and expenses of Bank's counsel) arising out of or resulting from the construction of any improvements on the real property collateral, or the ownership, operation, or use of the real property collateral, whether such claims are based on theories of derivative liability, comparative negligence or otherwise. The Borrower's obligations to the Bank under this Paragraph shall survive termination of this Agreement and repayment of the Borrower's obligations to the Bank under this Agreement, and shall also survive as unsecured obligations after any acquisition by the Bank of the real property collateral or any part of it by foreclosure or any other means.

**8.   HAZARDOUS SUBSTANCES**

**8.1   Indemnity Regarding Hazardous Substances.** The Borrower agrees to indemnify and hold the Bank harmless from and against all liabilities, claims, actions, foreseeable and unforeseeable consequential damages, costs and expenses (including sums paid in settlement of claims and all consultant, expert and legal fees and expenses of the Bank's counsel) or loss directly or indirectly arising out of or resulting from any of the following:

(a)      Any hazardous substance being present at any time, whether before, during or after any construction, in or around any part of the real property collateral securing this Agreement (the "Real Property"), or in the soil, groundwater or soil vapor on or under the Real Property, including those incurred in connection with any investigation of site conditions or any clean-up, remedial, removal or restoration work, or any resulting damages or injuries to the person or property of any third parties or to any natural resources.

27

(b)   Any use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a hazardous substance. This indemnity will apply whether the hazardous substance is on, under or about any of the Borrower's property or operations or property leased to the Borrower, whether or not the property has been taken by the Bank as collateral.

Upon demand by the Bank, the Borrower will defend any investigation, action or proceeding alleging the presence of any hazardous substance in any such location, which affects the Real Property or which is brought or commenced against the Bank, whether alone or together with the Borrower or any other person, all at the Borrower's own cost and by counsel to be approved by the Bank in the exercise of its reasonable judgment. In the alternative, the Bank may elect to conduct its own defense at the expense of the Borrower. The Borrower's obligations to the Bank under this Article, except the obligation to give notices to the Bank, shall survive termination of this Agreement, repayment of the Borrower's obligations to the Bank under this Agreement, and foreclosure of the deed of trust or mortgage encumbering the Real Property or similar proceedings.

8.2   **Representation and Warranty Regarding Hazardous Substances.** Before signing this Agreement, the Borrower researched and inquired into the previous uses and ownership of the Real Property. Based on that due diligence, the Borrower represents and warrants that to the best of its knowledge, no hazardous substance has been disposed of or released or otherwise exists in, on, under or onto the Real Property, except as the Borrower has disclosed to the Bank in writing.

8.3   **Compliance Regarding Hazardous Substances.** The Borrower has complied, and will comply and cause all occupants of the Real Property to comply, with all current and future laws, regulations and ordinances or other requirements of any governmental authority relating to or imposing liability or standards of conduct concerning protection of health or the environment or hazardous substances ("Environmental Laws"). The Borrower shall promptly, at the Borrower's sole cost and expense, take all reasonable actions with respect to any hazardous substances or other environmental condition at, on, or under the Real Property necessary to (i) comply with all applicable Environmental Laws; (ii) allow continued use, occupation or operation of the Real Property; or (iii) maintain the fair market value of the Real Property. The Borrower acknowledges that hazardous substances may permanently and materially impair the value and use of the Real Property.

8.4   **Notices Regarding Hazardous Substances.** Until full repayment of the loan, the Borrower will promptly notify the Bank in writing if it knows, suspects or believes there may be any hazardous substance in or around the Real Property, or in the soil, groundwater or soil vapor on or under the Real Property, or that the Borrower or the Real Property may be subject to any threatened or pending investigation by any governmental agency under any current or future law, regulation or ordinance pertaining to any hazardous substance.

8.5   **Site Visits, Observations and Testing.** The Bank and its agents and representatives will have the right at any reasonable time, after giving reasonable notice to the Borrower, to enter and visit the Real Property and any other locations where any personal property collateral securing this Agreement is located, for the purposes of observing the Real Property and the personal property collateral, taking and removing environmental samples, and conducting tests on any part of the Real Property. The Borrower shall reimburse the Bank on demand for the costs of any such environmental investigation and testing. The Bank will make reasonable efforts during any site visit, observation or testing conducted pursuant this paragraph to avoid interfering with the Borrower's use of the Real Property or the personal property collateral or to conduct tests, and any such acts by the Bank will be solely for the purposes of protecting the Bank's security and preserving the Bank's rights under this Agreement. No site visit, observation or testing or any report or findings made as a result thereof ("Environmental Report") (i) will result in a waiver of any default of the Borrower; (ii) impose any liability on the Bank; or (ii) be a representation or warranty of any kind regarding the Real Property or the personal property collateral (including its condition or value or compliance with any laws) or the Environmental Report (including its accuracy or completeness). In the event the Bank has a duty or obligation under applicable laws, regulations or other requirements to disclose an Environmental Report to the Borrower or any other party, the Borrower authorizes the Bank to make such a disclosure. The Bank may also disclose an Environmental Report to any regulatory authority, and to any other parties as necessary or appropriate in the Bank's judgment. The Borrower further understands and agrees that any Environmental Report or other information regarding a site visit, observation or testing that is disclosed to the Borrower by the Bank or its agents and representatives is to be evaluated (including any reporting or other disclosure obligations of the Borrower) by the Borrower without advice or assistance from the Bank.

8.6   **Unsecured Obligation.** Notwithstanding any provision in the deed of trust or mortgage encumbering the Real Property, the Borrower's obligations to the Bank under this Article are not secured by the Real Property.

28



**8.7    Definition of Hazardous Substance.** "Hazardous substance" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any current or future federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, including without limitation petroleum or natural gas.

## 9.    DEFAULT AND REMEDIES

If any of the following events of default occurs, the Bank may do one or more of the following without prior notice: declare the Borrower in default, stop making any additional credit available to the Borrower, and require the Borrower to repay its entire debt immediately. If an event which, with notice or the passage of time, will constitute an event of default has occurred and is continuing, the Bank has no obligation to make advances or extend additional credit under this Agreement. In addition, if any event of default occurs, the Bank shall have all rights, powers and remedies available under any instruments and agreements required by or executed in connection with this Agreement, as well as all rights and remedies available at law or in equity. If an event of default occurs under the paragraph entitled "Bankruptcy," below, with respect to the Borrower, then the entire debt outstanding under this Agreement will automatically be due immediately.

**9.1    Failure to Pay.** The Borrower fails to make a payment under this Agreement when due.

**9.2    Other Bank Agreements.** Any default occurs under any other agreement the Borrower (or any Obligor) has with the Bank or any affiliate of the Bank. For purposes of this Agreement, "Obligor" shall mean any guarantor, any party pledging collateral to the Bank, or, if the Borrower is comprised of the trustees of a trust, any trustor.

**9.3    Cross-default.** Any default occurs under any agreement in connection with any credit the Borrower (or any Obligor) has obtained from anyone else or which the Borrower (or any Obligor) or any of the Borrower's related entities or affiliates has guaranteed.

**9.4    False Information.** The Borrower or any Obligor has given the Bank false or misleading information or representations.

**9.5    Bankruptcy.** The Borrower, any Obligor, or any general partner of the Borrower or of any Obligor files a bankruptcy petition, a bankruptcy petition is filed against any of the foregoing parties, or the Borrower, any Obligor, or any general partner of the Borrower or of any Obligor makes a general assignment for the benefit of creditors.

**9.6    Receivers.** A receiver or similar official is appointed for any portion of the Borrower's or any Obligor's business, or the business is terminated, or, if any Obligor is anything other than a natural person, such Obligor is liquidated or dissolved.

**9.7    Revocation or Termination.** If the Borrower is comprised of the trustee(s) of a trust, the trust is revoked or otherwise terminated or all or a substantial part of the Borrower's assets are distributed or otherwise disposed of.

**9.8    Lien Priority.** The Bank fails to have an enforceable first lien (except for any prior liens to which the Bank has consented in writing) on or security interest in any property given as security for this Agreement (or any guaranty).

**9.9    Judgments.** Any judgments or arbitration awards are entered against the Borrower or any Obligor.

**9.10    Death.** If the Borrower or any Obligor is a natural person, the Borrower or such Obligor dies or becomes legally incompetent; if the Borrower or any Obligor is a trust, a trustor dies or becomes legally incompetent; if the Borrower or any Obligor is a partnership, any general partner dies or becomes legally incompetent.

**9.11    Material Adverse Change.** A material adverse change occurs, or is reasonably likely to occur, in the Borrower's (or any Obligor's) business condition (financial or otherwise), operations, properties or prospects, or ability to repay the credit.

**9.12    Government Action.** Any government authority takes action that the Bank believes materially adversely affects the Borrower's or any Obligor's financial condition or ability to repay.

**9.13    Default under Related Documents.** Any default occurs under any guaranty, subordination agreement, security agreement, deed of trust, mortgage, or other document required by or delivered in connection with this Agreement or any such document is no longer in effect, or any guarantor purports to revoke or disavow the guaranty.

- 10 -

29

**9.14    Other Breach Under Agreement.** A default occurs under any other term or condition of this Agreement not specifically referred to in this Article. This includes any failure or anticipated failure by the Borrower (or any other party named in the Covenants section) to comply with any financial covenants set forth in this Agreement, whether such failure is evidenced by financial statements delivered to the Bank or is otherwise known to the Borrower or the Bank.

## 10.    ENFORCING THIS AGREEMENT; MISCELLANEOUS

**10.1    GAAP.** Except as otherwise stated in this Agreement, all financial information provided to the Bank and all financial covenants will be made under generally accepted accounting principles, consistently applied or another basis acceptable to the Bank.

**10.2    Governing Law.** This Agreement is governed by California law.

**10.3    Successors and Assigns.** This Agreement is binding on the Borrower's and the Bank's successors and assignees. The Borrower agrees that it may not assign this Agreement without the Bank's prior consent.

**10.4    Dispute Resolution Provision.** This paragraph, including the subparagraphs below, is referred to as the "Dispute Resolution Provision." This Dispute Resolution Provision is a material inducement for the parties entering into this agreement.

(a)    This Dispute Resolution Provision concerns the resolution of any controversies or claims between the parties, whether arising in contract, tort or by statute, including but not limited to controversies or claims that arise out of or relate to: (i) this agreement (including any renewals, extensions or modifications); or (ii) any document related to this agreement (collectively a "Claim"). For the purposes of this Dispute Resolution Provision only, the term "parties" shall include any parent corporation, subsidiary or affiliate of the Bank involved in the servicing, management or administration of any obligation described or evidenced by this agreement.

(b)    At the request of any party to this agreement, any Claim shall be resolved by binding arbitration in accordance with the Federal Arbitration Act (Title 9, U.S. Code) (the "Act"). The Act will apply even though this agreement provides that it is governed by the law of a specified state.

(c)    Arbitration proceedings will be determined in accordance with the Act, the then-current rules and procedures for the arbitration of financial services disputes of the American Arbitration Association or any successor thereof ("AAA"), and the terms of this Dispute Resolution Provision. In the event of any inconsistency, the terms of this Dispute Resolution Provision shall control. If AAA is unwilling or unable to (i) serve as the provider of arbitration or (ii) enforce any provision of this arbitration clause, the Bank may designate another arbitration organization with similar procedures to serve as the provider of arbitration.

(d)    The arbitration shall be administered by AAA and conducted, unless otherwise required by law, in any U.S. state where real or tangible personal property collateral this credit is located or if there is no such collateral, in the state specified in the governing law section of this agreement. All Claims shall be determined by one arbitrator; however, if Claims exceed Five Million Dollars ($5,000,000), upon the request of any party, the Claims shall be decided by three arbitrators. All arbitration hearings shall commence within ninety (90) days of the demand for arbitration and close within ninety (90) days of commencement and the award of the arbitrator(s) shall be issued within thirty (30) days of the close of the hearing. However, the arbitrator(s), upon a showing of good cause, may extend the commencement of the hearing for up to an additional sixty (60) days. The arbitrator(s) shall provide a concise written statement of reasons for the award. The arbitration award may be submitted to any court having jurisdiction to be confirmed and have judgment entered and enforced.

(e)    The arbitrator(s) will give effect to statutes of limitation in determining any Claim and may dismiss the arbitration on the basis that the Claim is barred. For purposes of the application of any statutes of limitation, the service on AAA under applicable AAA rules of a notice of Claim is the equivalent of the filing of a lawsuit. Any dispute concerning this arbitration provision or whether a Claim is arbitrable shall be determined by the arbitrator(s), except as set forth at subparagraph (j) of this Dispute Resolution Provision. The arbitrator(s) shall have the power to award legal fees pursuant to the terms of this agreement.

(f)    The procedure described above will not apply if the Claim, at the time of the proposed submission to arbitration, arises from or relates to an obligation to the Bank secured by real property. In this case, all of the parties to this agreement must consent to submission of the Claim to arbitration.

(g)    To the extent any Claims are not arbitrated, to the extent permitted by law the Claims shall be resolved in court by

30



a judge without a jury, except any Claims which are brought in California state court shall be determined by judicial reference as described below.

(h)    Any Claim which is not arbitrated and which is brought in California state court will be resolved by a general reference to a referee (or a panel of referees) as provided in California Code of Civil Procedure Section 638. The referee (or presiding referee of the panel) shall be a retired Judge or Justice. The referee (or panel of referees) shall be selected by mutual written agreement of the parties. If the parties do not agree, the referee shall be selected by the Presiding Judge of the Court (or his or her representative) as provided in California Code of Civil Procedure Section 638 and the following related sections. The referee shall determine all issues in accordance with existing California law and the California rules of evidence and civil procedure. The referee shall be empowered to enter equitable as well as legal relief, provide all temporary or provisional remedies, enter equitable orders that will be binding on the parties and rule on any motion which would be authorized in a trial, including without limitation motions for summary judgment or summary adjudication. The award that results from the decision of the referee(s) will be entered as a judgment in the court that appointed the referee, in accordance with the provisions of California Code of Civil Procedure Sections 644(a) and 645. The parties reserve the right to seek appellate review of any judgment or order, including but not limited to, orders pertaining to class certification, to the same extent permitted in a court of law.

(i)    This Dispute Resolution Provision does not limit the right of any party to: (i) exercise self-help remedies, such as but not limited to, setoff, (ii) initiate judicial or non-judicial foreclosure against any real or personal property collateral; (iii) exercise any judicial or power of sale rights, or (iv) act in a court of law to obtain an interim remedy, such as but not limited to, injunctive relief, writ of possession or appointment of a receiver, or additional or supplementary remedies. The filing of a court action is not intended to constitute a waiver of the right of any party, including the suing party, thereafter to require submittal of the Claim to arbitration or judicial reference.

(j)    Any arbitration, judicial reference or trial by a judge of any Claim will take place on an individual basis without resort to any form of class or representative action (the "Class Action Waiver"). Regardless of anything else in this Dispute Resolution Provision, the validity and effect of the Class Action Waiver may be determined only by a court or referee and not by an arbitrator. The parties to this Agreement acknowledge that the Class Action Waiver is material and essential to the arbitration of any disputes between the parties and is nonseverable from the agreement to arbitrate Claims. If the Class Action Waiver is limited, voided or found unenforceable, then the parties' agreement to arbitrate shall be null and void with respect to such proceeding, subject to the right to appeal the limitation or invalidation of the Class Action Waiver. **The Parties acknowledge and agree that under no circumstances will a class action be arbitrated.**

(k)    By agreeing to binding arbitration or judicial reference, the parties irrevocably and voluntarily waive any right they may have to a trial by jury as permitted by law in respect of any Claim. Furthermore, without intending in any way to limit this Dispute Resolution Provision, to the extent any Claim is not arbitrated or submitted to judicial reference, the parties irrevocably and voluntarily waive any right they may have to a trial by jury to the extent permitted by law in respect of such Claim. This waiver of jury trial shall remain in effect even if the Class Action Waiver is limited, voided or found unenforceable. WHETHER THE CLAIM IS DECIDED BY ARBITRATION, BY JUDICIAL REFERENCE, OR BY TRIAL BY A JUDGE, THE PARTIES AGREE AND UNDERSTAND THAT THE EFFECT OF THIS AGREEMENT IS THAT THEY ARE GIVING UP THE RIGHT TO TRIAL BY JURY TO THE EXTENT PERMITTED BY LAW.

**10.5    Severability; Waivers.** If any part of this Agreement is not enforceable, the rest of the Agreement may be enforced. The Bank retains all rights, even if it makes a loan after default. If the Bank waives a default, it may enforce a later default. Any consent or waiver under this Agreement must be in writing.

**10.6    Attorneys' Fees.** The Borrower shall reimburse the Bank for any reasonable costs and attorneys' fees incurred by the Bank in connection with the enforcement or preservation of any rights or remedies under this Agreement and any other documents executed in connection with this Agreement, and in connection with any amendment, waiver, "workout" or restructuring under this Agreement. In the event of a lawsuit or arbitration proceeding, the prevailing party is entitled to recover costs and reasonable attorneys' fees incurred in connection with the lawsuit or arbitration proceeding, as determined by the court or arbitrator. In the event that any case is commenced by or against the Borrower under the Bankruptcy Code (Title 11, United States Code) or any similar or successor statute, the Bank is entitled to recover costs and reasonable attorneys' fees incurred by the Bank related to the preservation, protection, or enforcement of any rights of the Bank in such a case. To the extent permitted by law, as used in this paragraph, "attorneys' fees" includes the allocated costs of the Bank's in-house counsel.

AFS Loan Agreement

- 2 -

31

**10.7    Individual Liability.** If the Borrower is a natural person, the Bank may proceed against the Borrower's business and non-business property in enforcing this and other agreements relating to this loan. If the Borrower is a partnership, the Bank may proceed against the business and non-business property of each general partner of the Borrower in enforcing this and other agreements relating to this loan.

**10.8    Joint and Several Liability.** If two or more Borrowers sign this Agreement, each Borrower agrees that it is jointly and severally liable to the Bank for the payment of all obligations arising under this Agreement, and that such liability is independent of the obligations of the other Borrowers.

**10.9    Set-Off.**

(a)    In addition to any rights and remedies of the Bank provided by law, upon the occurrence and during the continuance of any event of default under this Agreement, the Bank is authorized, at any time, to set off and apply any and all Deposits of the Borrower or any Obligor held by the Bank against any and all Obligations owing to the Bank. The set-off may be made irrespective of whether or not the Bank shall have made demand under this Agreement or any guaranty, and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable Deposits.

(b)    The set-off may be made without prior notice to the Borrower or any other party, any such notice being waived by the Borrower (on its own behalf and on behalf of each Obligor) to the fullest extent permitted by law. The Bank agrees promptly to notify the Borrower after any such set-off and application; provided, however, that the failure to give such notice shall not affect the validity of such set-off and application.

(c)    For the purposes of this paragraph, "Deposits" means any deposits (general or special, time or demand, provisional or final, individual or joint) and any instruments owned by the Borrower or any Obligor which come into the possession or custody or under the control of the Bank. "Obligations" means all obligations, now or hereafter existing, of the Borrower to the Bank under this Agreement and under any other agreement or instrument executed in connection with this Agreement, and the obligations to the Bank of any Obligor.

**10.10    One Agreement.** This Agreement and any related security or other agreements required by this Agreement, collectively:

(a)    represent the sum of the understandings and agreements between the Bank and the Borrower concerning this credit;

(b)    replace any prior oral or written agreements between the Bank and the Borrower concerning this credit; and

(c)    are intended by the Bank and the Borrower as the final, complete and exclusive statement of the terms agreed to by them.

In the event of any conflict between this Agreement and any other agreements required by this Agreement, this Agreement will prevail.

**10.11    Indemnification.** The Borrower will indemnify and hold the Bank harmless from any loss, liability, damages, judgments, and costs of any kind relating to or arising directly or indirectly out of (a) this Agreement or any document required hereunder, (b) any credit extended or committed by the Bank to the Borrower hereunder, and (c) any litigation or proceeding related to or arising out of this Agreement, any such document, or any such credit. This indemnity extends to the Bank, but is not limited to attorneys' fees (including the allocated cost of in-house counsel). This indemnity includes the Bank, its parent, subsidiaries and all of their directors, officers, employees, agents, successors, attorneys, and assigns. This indemnity will survive repayment of the Borrower's obligations to the Bank. All sums due to the Bank hereunder shall be obligations of the Borrower, due and payable immediately without demand.

**10.12    Notices.** Unless otherwise provided in this Agreement or in another agreement between the Bank and the Borrower, all notices required under this Agreement shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier to the addresses on the signature page of this Agreement, or to such other addresses as the Bank and the Borrower may specify from time to time in writing. Notices and other communications shall be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, or (ii) if hand-delivered, by courier or otherwise (including telegram, telegram or mailgram), when delivered.

**10.13    Headings.** Article and paragraph headings are for reference only and shall not affect the interpretation or meaning of any provisions of this Agreement.

- 13 -

AFS Loan Agreement

32

**10.14  Counterparts.** This Agreement may be executed in as many counterparts as necessary or convenient, and by the different parties on separate counterparts each of which, when so executed, shall be deemed an original but all such counterparts shall constitute but one and the same agreement.

**10.15  Borrower Information; Reporting to Credit Bureaus.** The Borrower authorizes the Bank at any time to verify or check any information given by the Borrower to the Bank, check the Borrower's credit references, verify employment, and obtain credit reports. The Borrower agrees that the Bank shall have the right at all times to disclose and report to credit reporting agencies and credit rating agencies such information pertaining to the Borrower and/or all guarantors as is consistent with the Bank's policies and practices from time to time in effect.

This Agreement is executed as of the date stated at the top of the first page.

Bank:

Bank of America, N.A.

By: _____
Authorized Signer, Officer

Borrower:

Avenue J8, LLC

Members:

Nereus Holdings Limited Partnership

By: _____
Bruce Torkan, M.D., Managing Partner

_____
Ronnie Yona, Trustee of the Yona Family Trust

_____
Caroline Yona, Trustee of the Yona Family Trust

Address where notices to the Bank are to be sent:          Address where notices to the Borrower are to be sent:

Bank of America, N.A.
Pasadena - Attn. Notice Desk
CA9-702-05-71
101 S. Marengo Avenue, 5th Floor

AFS Loan Agreement

- 14 -

*33*

Pasadena, CA  91101-2428

**Waiver of Prepayment Right.**  By its signature below, the Borrower waives any right, under California Civil Code Section 2954.10 or otherwise, to prepay any portion of the outstanding principal balance under this Agreement without a prepayment fee to the extent required above.  The Borrower acknowledges that prepayment of the principal balance may result in the Bank incurring additional losses, costs, expenses and liabilities, including lost revenue and lost profits.  The Borrower therefore agrees to pay a prepayment fee to the extent described above if any principal amount is prepaid, whether voluntarily or by reason of acceleration, including acceleration upon any sale or other transfer of any interest in the real property collateral.  The Borrower further agrees that the Bank's willingness to offer the interest rate described above to the Borrower is sufficient and independent consideration, given individual weight by the Bank, for this waiver.  The Borrower understands that the Bank would not offer such an interest rate to the Borrower absent this waiver.  The Borrower understands that the Bank would not offer such an interest rate to the Borrower absent this waiver.

Avenue J8, LLC

Members:

Nereus Holdings Limited Partnership

By: _____
Bruce Torkan, M.D., Managing Partner

_____
Ronnie Yona, Trustee of the Yona Family Trust

_____
Caroline Yona, Trustee of the Yona Family Trust

- 15 -

AFS Loan Agreement

34

*Federal law requires Bank of America, N.A. (the "Bank") to provide the following notice. The notice is not part of the foregoing agreement or instrument and may not be altered. Please read the notice carefully.*

**(1)    USA PATRIOT ACT NOTICE**

Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan. The Bank will ask for the Borrower's legal name, address, tax ID number or social security number and other identifying information. The Bank may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of the Borrower, guarantors or other related persons.

35

36

Bank of America 

## AMENDMENT NO. 1 TO LOAN AGREEMENT

This Amendment No. 1 (the "Amendment") dated as of July 17, 2009, is between Bank of America, N.A. (the "Bank") and Avenue J5, LLC (the "Borrower").

### RECITALS

A. The Bank and the Borrower entered into a certain Loan Agreement dated as of July 2, 2009 (together with any previous amendments, the "Agreement").

B. The Bank and the Borrower desire to amend the Agreement.

### AGREEMENT

1. **Definitions.** Capitalized terms used but not defined in this Amendment shall have the meaning given to them in the Agreement.

2. **Amendments.** The Agreement is hereby amended as follows:

2.1 In Paragraph 1.3 (b), the date "July 15, 2009" is changed to "July 15, 2014".

3. **Representations and Warranties.** When the Borrower signs this Amendment, the Borrower represents and warrants to the Bank that: (a) there is no event which is, or with notice or lapse of time or both would be, a default under the Agreement except those events, if any, that have been disclosed in writing to the Bank or waived in writing by the Bank (b) the representations and warranties in the Agreement are true as of the date of this Amendment as if made on the date of this Amendment; (c) this Amendment does not conflict with any law, agreement, or obligation by which the Borrower is bound, and (d) if the Borrower is a business entity or a trust, this Amendment is within the Borrower's powers, has been duly authorized, and does not conflict with any of the Borrower's organizational papers.

4. **Effect of Amendment.** Except as provided in this Amendment, all of the terms and conditions of the Agreement shall remain in full force and effect.

5. **Counterparts.** This Amendment may be executed in counterparts, each of which when so executed shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

6. **FINAL AGREEMENT.** BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS DOCUMENT REPRESENTS THE FINAL AGREEMENT BETWEEN PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

This Amendment is executed as of the date stated at the beginning of this Amendment.

Ref #: 100175243 - Avenue J5, LLC
Amendment to Loan Agreement

- 1 -

EXHIBIT B

37

BANK:

Bank of America, N.A.

By: _____
    Alexander Eng, Vice President


BORROWER(S):

Avenue J8, LLC

Members:

Nereus Holdings Limited Partnership

By: _____
    Bruce Forkan, M.D. Managing Partner


_____
Ronnie Yona, Trustee of the Yona Family Trust


_____
Caroline Yona, Trustee of the Yona Family Trust

*38*

09/18/2009 10:09 FAX                                                        ☑001

**Bank of America** 

# AMENDMENT NO. 1 TO LOAN AGREEMENT

This Amendment No. 1 (the "Amendment") dated as of July 17, 2009, is between Bank of America, N.A. (the "Bank") and Avenue J8, LLC (the "Borrower").

## RECITALS

A.  The Bank and the Borrower entered into a certain Loan Agreement dated as of July 2, 2009 (together with any previous amendments, the "Agreement").

B.  The Bank and the Borrower desire to amend the Agreement.

## AGREEMENT

1.  **Definitions.** Capitalized terms used but not defined in this Amendment shall have the meaning given to them in the Agreement.

2.  **Amendments.** The Agreement is hereby amended as follows:

2.1  In Paragraph 1.3 (b), the date "July 15, 2009" is changed to "July 15, 2014".

3.  **Representations and Warranties.** When the Borrower signs this Amendment, the Borrower represents and warrants to the Bank that: (a) there is no event which is, or with notice or lapse of time or both would be, a default under the Agreement except those events, if any, that have been disclosed in writing to the Bank or waived in writing by the Bank (b) the representations and warranties in the Agreement are true as of the date of this Amendment as if made on the date of this Amendment, (c) this Amendment does not conflict with any law, agreement, or obligation by which the Borrower is bound, and (d) if the Borrower is a business entity or a trust, this Amendment is within the Borrower's powers, has been duly authorized, and does not conflict with any of the Borrower's organizational papers.

4.  **Effect of Amendment.** Except as provided in this Amendment, all of the terms and conditions of the Agreement shall remain in full force and effect.

5.  **Counterparts.** This Amendment may be executed in counterparts, each of which when so executed shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

6.  **FINAL AGREEMENT. BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS DOCUMENT REPRESENTS THE FINAL AGREEMENT BETWEEN PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.**

This Amendment is executed as of the date stated at the beginning of this Amendment.

39

09/16/2009 10:09 FAX ⬚002

**BANK:**

Bank of America, N.A.

By: _____
   Alexander Eng, Vice President

**BORROWER(S):**

Avenue J8, LLC

Members:

Nereus Holdings Limited Partnership

By: _____
   Bruce Torkan, M.D. Managing Partner

_____
Ronnie Yona, Trustee of the Yona Family Trust

_____
Caroline Yona, Trustee of the Yona Family Trust

40

H/1

**Bank of America** 🇺🇸

BORROWER: Avenue J8, LLC

GUARANTOR: Bruce Torkan

## CONTINUING AND UNCONDITIONAL GUARANTY

To:   Bank of America, N.A.

    1.  The Guaranty.  For valuable consideration, the undersigned ("Guarantor") hereby unconditionally guarantees and promises to pay promptly to Bank of America, N.A., its subsidiaries and affiliates (collectively, "Bank"), or order, in lawful money of the United States, any and all Indebtedness of Avenue J8, LLC ("Borrower") to Bank when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter. The liability of Guarantor under this Guaranty is not limited as to the principal amount of the Indebtedness guaranteed and includes, without limitation, liability for all interest, fees, indemnities (including, without limitation, hazardous waste indemnities), and other costs and expenses relating to or arising out of the Indebtedness and for all Swap Obligations now or hereafter owing from Borrower to Bank.  The liability of Guarantor is continuing and relates to any Indebtedness, including that arising under successive transactions which shall either continue the Indebtedness or from time to time renew it after it has been satisfied.  This Guaranty is cumulative and does not supersede any other outstanding guaranties, and the liability of Guarantor under this Guaranty is exclusive of Guarantor's liability under any other guaranties signed by Guarantor.  If multiple individuals or entities sign this Guaranty, their obligations under this Guaranty shall be joint and several. If Guarantor is a subsidiary or affiliate of Borrower, Guarantor's liability hereunder shall not exceed at any one time the largest amount during the period commencing with Guarantor's execution of this Guaranty and thereafter that would not render Guarantor's obligations hereunder subject to avoidance under Section 548 of the Bankruptcy Code (Title 11, United States Code) or any comparable provisions of any applicable state law.

    2.  Definitions.

        (a)  "Bank Agreements" shall mean all agreements, documents, and instruments evidencing any of the Indebtedness, including but not limited to all loan agreements between Borrower and Bank and promissory notes from Borrower in favor of Bank, and all deeds of trust, mortgages, security agreements, and other agreements, documents, and instruments executed by Borrower in connection with the Indebtedness, all as now in effect and as hereafter amended, restated, renewed, or superseded.

        (b)  "Borrower" shall mean the individual or the entity named in Paragraph 1 of this Guaranty and, if more than one, then any one or more of them.

        (c)  "Guarantor" shall mean the individual or the entity signing this Guaranty and, if more than one, then any one or more of them.

        (d)  "Indebtedness" shall mean any and all debts, liabilities, and obligations of Borrower to Bank, now or hereafter existing, whether voluntary or involuntary and however arising, whether direct or indirect or acquired by Bank by assignment, succession, or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, held or to be held by Bank for its own account or as agent for another or others, whether Borrower may be liable individually or jointly with others, whether recovery upon such debts, liabilities, and obligations may be or hereafter

- 10 -

Continuing or Limited Guaranty

EXHIBIT C

42

become barred by any statute of limitations, and whether such debts, liabilities, and obligations may be or hereafter become otherwise unenforceable. Indebtedness includes, without limitation, any and all Swap Obligations and any and all obligations of Borrower to Bank for reasonable attorneys' fees and all other costs and expenses incurred by Bank in the collection or enforcement of any debts, liabilities, and obligations of Borrower to Bank.

(e) "Swap Obligations" shall mean all obligations of Borrower arising under any interest rate, credit, commodity or equity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross currency rate swap, currency option, securities puts, calls, collars, options or forwards or any combination of, or option with respect to, these or similar transactions now or hereafter entered into between Borrower and Bank.

3. **Obligations Independent.** The obligations hereunder are independent of the obligations of Borrower or any other guarantor, and a separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or any other guarantor or whether Borrower or any other guarantor be joined in any such action or actions. Anyone executing this Guaranty shall be bound by its terms without regard to execution by anyone else.

4. **Rights of Bank.** Guarantor authorizes Bank, without notice or demand and without affecting its liability hereunder, from time to time to:

(a) renew, compromise, extend, accelerate, or otherwise change the time for payment, or otherwise change the terms, of the Indebtedness or any part thereof, including increase or decrease of the rate of interest thereon, or otherwise change the terms of any Bank Agreements;

(b) receive and hold security for the payment of this Guaranty or any Indebtedness and exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any such security;

(c) apply such security and direct the order or manner of sale thereof as Bank in its discretion may determine;

(d) release or substitute any Guarantor or any one or more of any endorsers or other guarantors of any of the Indebtedness; and

(e) permit the Indebtedness to exceed Guarantor's liability under this Guaranty, and Guarantor agrees that any amounts received by Bank from any source other than Guarantor shall be deemed to be applied first to any portion of the Indebtedness not guaranteed by Guarantor.

5. **Guaranty to be Absolute.** Guarantor agrees that until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated, Guarantor shall not be released by or because of the taking, or failure to take, any action that might in any manner or to any extent vary the risks of Guarantor under this Guaranty or that, but for this paragraph, might discharge or otherwise reduce, limit, or modify Guarantor's obligations under this Guaranty. Guarantor waives and surrenders any defense to any liability under this Guaranty based upon any such action, including but not limited to any action of Bank described in the immediately preceding paragraph of this Guaranty. It is the express intent of Guarantor that Guarantor's obligations under this Guaranty are and shall be absolute and unconditional.

6. **Guarantor's Waivers of Certain Rights and Certain Defenses.** Guarantor waives:

(a) any right to require Bank to proceed against Borrower, proceed against or exhaust any security for the Indebtedness, or pursue any other remedy in Bank's power whatsoever;

(b) any defense arising by reason of any disability or other defense of Borrower, or the cessation from any cause whatsoever of the liability of Borrower;

- 11 -

43

(c) any defense based on any claim that Guarantor's obligations exceed or are more burdensome than those of Borrower; and

(d) the benefit of any statute of limitations affecting Guarantor's liability hereunder.

No provision or waiver in this Guaranty shall be construed as limiting the generality of any other waiver contained in this Guaranty.

7. Waiver of Subrogation. Until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated, even though the Indebtedness may be in excess of Guarantor's liability hereunder, Guarantor waives to the extent permitted by applicable law any right of subrogation, reimbursement, indemnification, and contribution (contractual, statutory, or otherwise) including, without limitation, any claim or right of subrogation under the Bankruptcy Code (Title 11, United States Code) or any successor statute, arising from the existence or performance of this Guaranty, and Guarantor waives to the extent permitted by applicable law any right to enforce any remedy that Bank now has or may hereafter have against Borrower, and waives any benefit of, and any right to participate in, any security now or hereafter held by Bank.

8. Waiver of Notices. Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of intent to accelerate, notices of acceleration, notices of any suit or any other action against Borrower or any other person, any other notices to any party liable on any Bank Agreement (including Guarantor), notices of acceptance of this Guaranty, notices of the existence, creation, or incurring of new or additional Indebtedness to which this Guaranty applies or any other Indebtedness of Borrower to Bank, and notices of any fact that might increase Guarantor's risk.

9. General Partner Liability and Waivers of Other Rights and Defenses.

(a) If Borrower is a partnership and Guarantor is a general partner of that partnership, then Guarantor shall not be liable under this Guaranty for any portion of the Indebtedness that is secured by real property; provided, however, that Guarantor shall remain liable under partnership law for all the Indebtedness.

(b) Guarantor waives any rights and defenses that are or may become available to Guarantor by reason of Sections 2787 to 2855, inclusive, of the California Civil Code.

(c) Guarantor waives all rights and defenses that Guarantor may have because any of the Indebtedness is secured by real property. This means, among other things: (i) Bank may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower; and (ii) if Bank forecloses on any real property collateral pledged by Borrower: (1) the amount of the Indebtedness may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (2) Bank may collect from Guarantor even if Bank, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because any of the Indebtedness is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d, or 728 of the California Code of Civil Procedure.

(d) Guarantor waives any right or defense it may have at law or equity, including California Code of Civil Procedure Section 580a, to a fair market value hearing or action to determine a deficiency judgment after a foreclosure.

10. Security. To secure all of Guarantor's obligations hereunder, Guarantor assigns and grants to Bank a security interest in all moneys, securities, and other property of Guarantor now or hereafter in the possession of Bank, all deposit accounts of Guarantor maintained with Bank, and all proceeds thereof. Upon default or breach of any of Guarantor's obligations to Bank, Bank may apply any deposit account to reduce the

- 12 -

Continuing or Limited Guaranty

44

Indebtedness, and may foreclose any collateral as provided in the Uniform Commercial Code and in any security agreements between Bank and Guarantor.

11. Subordination. Any obligations of Borrower to Guarantor, now or hereafter existing, including but not limited to any obligations to Guarantor as subrogee of Bank or resulting from Guarantor's performance under this Guaranty, are hereby subordinated to the Indebtedness. In addition to Guarantor's waiver of any right of subrogation as set forth in this Guaranty with respect to any obligations of Borrower to Guarantor as subrogee of Bank, Guarantor agrees that, if Bank so requests, Guarantor shall not demand, take, or receive from Borrower, by setoff or in any other manner, payment of any other obligations of Borrower to Guarantor until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated. If any payments are received by Guarantor in violation of such waiver or agreement, such payments shall be received by Guarantor as trustee for Bank and shall be paid over to Bank on account of the Indebtedness, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty. Any security interest, lien, or other encumbrance that Guarantor may now or hereafter have on any property of Borrower is hereby subordinated to any security interest, lien, or other encumbrance that Bank may have on any such property.

12. Revocation of Guaranty.

(a) This Guaranty may be revoked at any time by Guarantor in respect to future transactions. Such revocation shall be effective upon actual receipt by Bank, at the address shown below or at such other address as may have been provided to Guarantor by Bank, of written notice of revocation. Revocation shall not affect any of Guarantor's obligations or Bank's rights with respect to transactions committed or entered into prior to Bank's receipt of such notice, regardless of whether or not the Indebtedness related to such transactions, before or after revocation, has been incurred, renewed, compromised, extended, accelerated, or otherwise changed as to any of its terms, including time for payment or increase or decrease of the rate of interest thereon, and regardless of any other act or omission of Bank authorized hereunder. Revocation by Guarantor shall not affect any obligations of any other guarantor.

(b) In the event of the death of a Guarantor, the liability of the estate of the deceased Guarantor shall continue in full force and effect as to (i) the Indebtedness existing at the date of death, and any renewals or extensions thereof, and (ii) loans or advances made to or for the account of Borrower after the date of the death of the deceased Guarantor pursuant to a commitment made by Bank to Borrower prior to the date of such death. As to all surviving Guarantors, this Guaranty shall continue in full force and effect after the death of a Guarantor, not only as to the Indebtedness existing at that time, but also as to the Indebtedness thereafter incurred by Borrower to Bank.

(c) Guarantor acknowledges and agrees that this Guaranty may be revoked only in accordance with the foregoing provisions of this paragraph and shall not be revoked simply as a result of any change in name, location, or composition or structure of Borrower, the dissolution of Borrower, or the termination, increase, decrease, or other change of any personnel or owners of Borrower.

13. Reinstatement of Guaranty. If this Guaranty is revoked, returned, or canceled, and subsequently any payment or transfer of any interest in property by Borrower to Bank is rescinded or must be returned by Bank to Borrower, this Guaranty shall be reinstated with respect to any such payment or transfer, regardless of any such prior revocation, return, or cancellation.

14. Stay of Acceleration. In the event that acceleration of the time for payment of any of the Indebtedness is stayed upon the insolvency, bankruptcy, or reorganization of Borrower or otherwise, all such Indebtedness guaranteed by Guarantor shall nonetheless be payable by Guarantor immediately if requested by Bank.

15. Information Relating to Borrower. Guarantor acknowledges and agrees that it has made such independent examination, review, and investigation of the Bank Agreements as Guarantor deems necessary and appropriate, including, without limitation, any covenants pertaining to Guarantor contained therein, and shall

- 13 -

45

have sole responsibility to obtain from Borrower any information required by Guarantor about any modifications thereto. Guarantor further acknowledges and agrees that it shall have the sole responsibility for, and has adequate means of, obtaining from Borrower such information concerning Borrower's financial condition or business operations as Guarantor may require, and that Bank has no duty, and Guarantor is not relying on Bank, at any time to disclose to Guarantor any information relating to the business operations or financial condition of Borrower.

16. Borrower's Authorization. Where Borrower is a corporation, partnership, or limited liability company, it is not necessary for Bank to inquire into the powers of Borrower or of the officers, directors, partners, members, managers, or agents acting or purporting to act on its behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder, subject to any limitations on Guarantor's liability set forth herein.

17. Guarantor Information; Reporting to Credit Bureaus. Guarantor authorizes Bank to verify or check any information given by Guarantor to Bank, check Guarantor's credit references, verify employment, and obtain credit reports. Guarantor agrees that Bank shall have the right at all times to disclose and report to credit reporting agencies and credit rating agencies such information pertaining to the Indebtedness and/or Guarantor as is consistent with Bank's policies and practices from time to time in effect. Guarantor acknowledges and agrees that the authorizations provided in this paragraph apply to any individual general partner of Guarantor and to Guarantor's spouse and any such general partner's spouse if Guarantor or such general partner is married and lives in a community property state.

18. Change of Status. Any Guarantor that is a business entity shall not enter into any consolidation, merger, or other combination unless Guarantor is the surviving business entity. Further, Guarantor shall not change its legal structure unless (a) Guarantor obtains the prior written consent of Bank and (b) all Guarantor's obligations under this Guaranty are assumed by the new business entity.

19. Remedies. If Guarantor fails to fulfill its duty to pay all Indebtedness guaranteed hereunder, Bank shall have all of the remedies of a creditor and, to the extent applicable, of a secured party, under all applicable law. Without limiting the foregoing to the extent permitted by law, Bank may, at its option and without notice or demand:

(a) declare any Indebtedness due and payable at once;

(b) take possession of any collateral pledged by Borrower or Guarantor, wherever located, and sell, resell, assign, transfer, and deliver all or any part of the collateral at any public or private sale or otherwise dispose of any or all of the collateral in its then condition, for cash or on credit or for future delivery, and in connection therewith Bank may impose reasonable conditions upon any such sale. Further, Bank, unless prohibited by law the provisions of which cannot be waived, may purchase all or any part of the collateral to be sold, free from and discharged of all trusts, claims, rights of redemption and equities of Borrower or Guarantor whatsoever. Guarantor acknowledges and agrees that the sale of any collateral through any nationally recognized broker-dealer, investment banker, or any other method common in the securities industry shall be deemed a commercially reasonable sale under the Uniform Commercial Code or any other equivalent statute or federal law, and expressly waives notice thereof except as provided herein; and

(c) set off against any or all liabilities of Guarantor all money owed by Bank or any of its agents or affiliates in any capacity to Guarantor, whether or not due, and also set off against all other liabilities of Guarantor to Bank all money owed by Bank in any capacity to Guarantor. If exercised by Bank, Bank shall be deemed to have exercised such right of setoff and to have made a charge against any such money immediately upon the occurrence of such default although made or entered on the books subsequent thereto.

20. Notices. All notices required under this Guaranty shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier, to the addresses on the signature page of this Guaranty, or sent by facsimile to the fax numbers listed on the signature page, or to such other addresses as Bank and

- 14 -

Continuing or Limited Guaranty

46

Guarantor may specify from time to time in writing. Notices sent by (a) first class mail shall be deemed delivered on the earlier of actual receipt or on the fourth business day after deposit in the U.S. mail, postage prepaid, (b) overnight courier shall be deemed delivered on the next business day, and (c) telecopy shall be deemed delivered when transmitted.

21. **Successors and Assigns.** This Guaranty (a) binds Guarantor and Guarantor's executors, administrators, successors, and assigns, provided that Guarantor may not assign its rights or obligations under this Guaranty without the prior written consent of Bank, and (b) inures to the benefit of Bank and Bank's indorsees, successors, and assigns. Bank may, without notice to Guarantor and without affecting Guarantor's obligations hereunder, sell, assign, grant participations in, or otherwise transfer to any other person, firm, or corporation the Indebtedness and this Guaranty, in whole or in part. Guarantor agrees that Bank may disclose to any assignee or purchaser, or any prospective assignee or purchaser, of all or part of the Indebtedness any and all information in Bank's possession concerning Guarantor, this Guaranty, and any security for this Guaranty.

22. **Amendments, Waivers, and Severability**  No provision of this Guaranty may be amended or waived except in writing. No failure by Bank to exercise, and no delay in exercising, any of its rights, remedies, or powers shall operate as a waiver thereof, and no single or partial exercise of any such right, remedy, or power shall preclude any other or further exercise thereof or the exercise of any other right, remedy, or power. The unenforceability or invalidity of any provision of this Guaranty shall not affect the enforceability or validity of any other provision of this Guaranty.

23. **Costs and Expenses.** Guarantor agrees to pay all reasonable attorneys' fees, including allocated costs of Bank's in-house counsel to the extent permitted by applicable law, and all other costs and expenses that may be incurred by Bank (a) in the enforcement of this Guaranty or (b) in the preservation, protection, or enforcement of any rights of Bank in any case commenced by or against Guarantor or Borrower under the Bankruptcy Code (Title 11, United States Code) or any similar or successor statute.

24. **Governing Law and Jurisdiction.** This Guaranty shall be governed by and construed and enforced in accordance with the law of the State of California. To the extent that Bank has greater rights or remedies under federal law, whether as a national bank or otherwise, this paragraph shall not be deemed to deprive Bank of such rights and remedies as may be available under federal law. Jurisdiction and venue for any action or proceeding to enforce this Guaranty shall be the forum appropriate for such action or proceeding against Borrower, to which jurisdiction Guarantor irrevocably submits and to which venue Guarantor waives to the fullest extent permitted by law any defense asserting an inconvenient forum in connection therewith. It is provided, however, that if Guarantor owns property in another state, notwithstanding that the forum for enforcement action is elsewhere, Bank may commence a collection proceeding in any state in which Guarantor owns property for the purpose of enforcing provisional remedies against such property. Service of process by Bank in connection with such action or proceeding shall be binding on Guarantor if sent to Guarantor by registered or certified mail at its address specified below.

25. **Dispute Resolution Provision.** This paragraph, including the subparagraphs below, is referred to as the "Dispute Resolution Provision." This Dispute Resolution Provision is a material inducement for the parties entering into this agreement.

(a) This Dispute Resolution Provision concerns the resolution of any controversies or claims between the parties, whether arising in contract, tort or by statute, including but not limited to controversies or claims that arise out of or relate to: (i) this agreement (including any renewals, extensions or modifications); or (ii) any document related to this agreement (collectively a "Claim"). For the purposes of this Dispute Resolution Provision only, the term "parties" shall include any parent corporation, subsidiary or affiliate of the Bank involved in the servicing, management or administration of any obligation described or evidenced by this agreement.

(b) At the request of any party to this agreement, any Claim shall be resolved by binding arbitration in accordance with the Federal Arbitration Act (Title 9, U.S. Code) (the "Act"). The Act will apply even though this agreement provides that it is governed by the law of a specified state.

- 15 -

47

(c)  Arbitration proceedings will be determined in accordance with the Act, the then-current rules and procedures for the arbitration of financial services disputes of the American Arbitration Association or any successor thereof ("AAA"), and the terms of this Dispute Resolution Provision. In the event of any inconsistency, the terms of this Dispute Resolution Provision shall control. If AAA is unwilling or unable to (i) serve as the provider of arbitration or (ii) enforce any provision of this arbitration clause, the Bank may designate another arbitration organization with similar procedures to serve as the provider of arbitration.

(d)  The arbitration shall be administered by AAA and conducted, unless otherwise required by law, in any U.S. state where real or tangible personal property collateral for this credit is located or if there is no such collateral, in the state specified in the governing law section of this agreement. All Claims shall be determined by one arbitrator; however, if Claims exceed Five Million Dollars ($5,000,000), upon the request of any party, the Claims shall be decided by three arbitrators. All arbitration hearings shall commence within ninety (90) days of the demand for arbitration and close within ninety (90) days of commencement and the award of the arbitrator(s) shall be issued within thirty (30) days of the close of the hearing. However, the arbitrator(s), upon a showing of good cause, may extend the commencement of the hearing for up to an additional sixty (60) days. The arbitrator(s) shall provide a concise written statement of reasons for the award. The arbitration award may be submitted to any court having jurisdiction to be confirmed and have judgment entered and enforced.

(e)  Except as waived by Guarantor in this Guaranty, the arbitrator(s) will give effect to statutes of limitation in determining any Claim and may dismiss the arbitration on the basis that the Claim is barred. For purposes of the application of any statutes of limitation, the service on AAA under applicable AAA rules of a notice of Claim is the equivalent of the filing of a lawsuit. Any dispute concerning this arbitration provision or whether a Claim is arbitrable shall be determined by the arbitrator(s), except as set forth at subparagraph (j) of this Dispute Resolution Provision. The arbitrator(s) shall have the power to award legal fees pursuant to the terms of this agreement.

(f)  The procedure described above will not apply if the Claim, at the time of the proposed submission to arbitration, arises from or relates to an obligation to the Bank secured by real property. In this case, all of the parties must consent to submission of the Claim to arbitration.

(g)  To the extent any Claims are not arbitrated, to the extent permitted by law the Claims shall be resolved in court by a judge without a jury, except any Claims which are brought in California state court shall be determined by judicial reference as described below.

(h)  Any Claim which is not arbitrated and which is brought in California state court will be resolved by a general reference to a referee (or a panel of referees) as provided in California Code of Civil Procedure Section 638. The referee (or presiding referee of the panel) shall be a retired Judge or Justice. The referee (or panel of referees) shall be selected by mutual written agreement of the parties. If the parties do not agree, the referee shall be selected by the Presiding Judge of the Court (or his or her representative) as provided in California Code of Civil Procedure Section 638 and the following related sections. The referee shall determine all issues in accordance with existing California law and the California rules of evidence and civil procedure. The referee shall be empowered to enter equitable as well as legal relief, provide all temporary or provisional remedies, enter equitable orders that will be binding on the parties and rule on any motion which would be authorized in a trial, including without limitation motions for summary judgment or summary adjudication . The award that results from the decision of the referee(s) will be entered as a judgment in the court that appointed the referee, in accordance with the provisions of California Code of Civil Procedure Sections 644(a) and 645. The parties reserve the right to seek appellate review of any judgment or order, including but not limited to, orders pertaining to class certification, to the same extent permitted in a court of law.

(i)  This Dispute Resolution Provision does not limit the right of any party to: (i) exercise self-help remedies, such as but not limited to, setoff; (ii) initiate judicial or non-judicial foreclosure against any real or personal property collateral; (iii) exercise any judicial or power of sale rights, or (iv) act in a court of law to obtain an interim remedy, such as but not limited to, injunctive relief, writ of possession or

- 18 -

48

appointment of a receiver, or additional or supplementary remedies. The filing of a court action is not intended to constitute a waiver of the right of any party, including the suing party, thereafter to require submittal of the Claim to arbitration or judicial reference.

(j)  Any arbitration, judicial reference or trial by a judge of any Claim will take place on an individual basis without resort to any form of class or representative action (the "Class Action Waiver"). Regardless of anything else in this Dispute Resolution Provision, the validity and effect of the Class Action Waiver may be determined only by a court or referee and not by an arbitrator.  The parties to this Agreement acknowledge that the Class Action Waiver is material and essential to the arbitration of any disputes between the parties and is nonseverable from the agreement to arbitrate Claims. If the Class Action Waiver is limited, voided or found unenforceable, then the parties' agreement to arbitrate shall be null and void with respect to such proceeding, subject to the right to appeal the limitation or invalidation of the Class Action Waiver.  **The Parties acknowledge and agree that under no circumstances will a class action be arbitrated.**

(k)  By agreeing to binding arbitration or judicial reference, the parties irrevocably and voluntarily waive any right they may have to a trial by jury as permitted by law in respect of any Claim. Furthermore, without intending in any way to limit this Dispute Resolution Provision, to the extent any Claim is not arbitrated or submitted to judicial reference, the parties irrevocably and voluntarily waive any right they may have to a trial by jury to the extent permitted by law in respect of such Claim.  This waiver of jury trial shall remain in effect even if the Class Action Waiver is limited, voided or found unenforceable.  **WHETHER THE CLAIM IS DECIDED BY ARBITRATION, BY JUDICIAL REFERENCE, OR BY TRIAL BY A JUDGE, THE PARTIES AGREE AND UNDERSTAND THAT THE EFFECT OF THIS AGREEMENT IS THAT THEY ARE GIVING UP THE RIGHT TO TRIAL BY JURY TO THE EXTENT PERMITTED BY LAW.**

26.  <u>FINAL AGREEMENT.</u>  BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT:  (A) THIS DOCUMENT REPRESENTS THE FINAL AGREEMENT BETWEEN PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

Executed this 2nd day of July, 2009.

Bruce Forkan

Address for notices to Bank:
Pasadena - Credit Services
Attn: Notice Desk
CA9-702-05-71
101 S. Marengo Avenue, 5th Floor
Pasadena, CA  91101-2428
Facsimile:

- 17 -

Continuing or Limited Guaranty

49

Address for notices to Guarantor:
Bruce Torkan
626 N. Rodeo Dr
Beverly Hills, CA 90210
Facsimile: _____

*Federal law requires Bank of America, N.A. (the "Bank") to provide the following two notices. The notices are not part of the foregoing agreement or instrument and may not be altered. Please read the notices carefully.*

*These notices apply only to individual Borrowers or Guarantors and individuals who are pledging collateral, granting a lien on real property or are otherwise obligated to the Bank (Obligors):*

**(1)    AFFILIATE SHARING NOTICE**

From time to time the Bank may share information about the Obligor's experience with Bank of America Corporation (or any successor company) and its subsidiaries and affiliated companies (the "Affiliates"), including, but not limited to, the Bank of America Companies listed in notice #2 below. The Bank may also share with the Affiliates credit-related information contained in any applications, from credit reports and information it may obtain about the Obligor from outside sources.

If the Obligor is an individual, the Obligor may instruct the Bank not to share this information with the Affiliates. The Obligor can make this election by (1) calling the Bank at 1 888.341.5000, (2) visiting the Bank online at www.bankofamerica.com, selecting "Privacy & Security," and then selecting "Set Your Privacy Preferences," or (3) contacting the Obligor's client manager or local banking center. To help the Bank complete the Obligor's request, the Obligor should include the Obligor's name, address, phone number, account number(s) and social security number.

If the Obligor makes this election, certain products or services may not be made available to the Obligor. This request will apply to information from applications, consumer reports and other outside sources only. Through the normal course of doing business, including servicing the Obligor's accounts and better serving the Obligor's financial needs, the Bank will continue to share transaction and account experience information, as well as other general information among the Affiliates.

**(2)    AFFILIATE MARKETING NOTICE – YOUR CHOICE TO LIMIT MARKETING**

- The Bank of America companies listed below are providing this notice #2.

- Federal law gives you the right to limit some but not all marketing from all the Bank of America affiliated companies. Federal law also requires us to give you this notice to tell you about your choice to limit marketing from all the Bank of America affiliated companies.

- You may limit all the Bank of America affiliated companies, such as the banking, loan, credit card, insurance and securities companies, from marketing their products or services to you based upon your personal information that they receive from other Bank of America companies. This information includes your income, your account history, and your credit score.

- Your choice to limit marketing offers from all the Bank of America affiliated companies will apply for at least 5 years from when you tell us your choice. Before your choice to limit marketing expires, you will receive a renewal notice that will allow you to continue to limit marketing offers from all the Bank of America affiliated companies for at least another 5 years.

- You may tell us your choice to limit marketing offers and you may tell us the choices for other customers who are joint account holders with you.

- 18 -

50

- This limitation will not apply in certain circumstances, such as when you have an account or service relationship with the Bank of America company that is marketing to you.

- For individuals with business purpose accounts, this limitation will only apply to marketing to individuals and not marketing to a business.

**To limit marketing offers, contact us at 800.282.2884**

**Bank of America Companies:**

**Banks and Trust Companies**
Bank of America, N.A.

**Credit Card**
Bank of America Consumer Card Services, LLC
Bank of America
Fleet Credit Card Services, L.P.

**Brokerage and Investments**
BACAP Alternative Advisors, Inc.
Bank of America Capital Advisors LLC
Banc of America Finance Services, Inc.
Banc of America Investment Advisors, Inc.
Banc of America Investment Services, Inc.
Banc of America Securities LLC
U.S. Trust Hedge Fund Management Inc.
UST Securities Corp.
White Ridge Investment Advisors LLC

**Insurance and Annuities**
BA Agency, Inc.
BA Insurance Services, Inc.
Balboa Insurance Company
Balboa Life Insurance Company
Balboa Life Insurance Company of New York
Balboa Warranty Services Corporation
Banc of America Agency, LLC
Banc of America Agency of Nevada, Inc.
Banc of America Agency of Texas, Inc.
Banc of America Insurance Services, Inc.
    dba in New York: Banc of America Insurance Agency
Countrywide Insurance Services, Inc.,
    dba in New York: CW Insurance Agency
Countrywide Insurance Services of Arizona, Inc.
Directnet Insurance Agency, Inc.
General Fidelity Insurance Company
General Fidelity Life Insurance Company
Meridian Insurance Company
Newport E & S Insurance Company
Newport Insurance Company

**Real Estate**
BAC Home Loans Servicing, LP
Countrywide Home Loans, Inc.
Countrywide Home Loans of Minnesota, Inc.
Countrywide Home Loans of Texas, Inc.

- 19 -

Continuing or Limited Guaranty

*51*

Countrywide Home Loans of Tennessee, Inc.
Countrywide Mortgage Ventures, LLC
HomeFocus Services, LLC
HomeFocus Tax Services, LLC
KB Home Mortgage, LLC
Landsafe, Inc.
LandSafe Services, Inc.
LandSafe Credit, Inc.
LandSafe Title of California, Inc.
LandSafe Title of Florida, Inc.
LandSafe Title of Texas, Inc.
LandSafe Title of Washington, Inc.
LandSafe Title of Ohio, Inc.
LandSafe Title of Alabama, Inc.
LandSafe Title of Maryland, Inc.
NationsCredit Financial Services Corporation

**Merchant Services**
BA Merchant Services, LLC

**Leasing Companies**
BAL Corporate Aviation, LLC
BAL Energy Holding, LLC
BAL Energy Management, LLC
BAL Investment & Advisory, Inc.
BAL Solar I, LLC
BAL Solar II, LLC
BAL Solar III, LLC
Banc of America Leasing & Capital, LLC
Banc of America Public and Institutional Financial Funding, LLC
Banc of America Public Finance Corp.
BAPCC II, LLC
Pydna Corp.

Continuing or Limited Guaranty

52

53

**Bank of America** 

BORROWER: Avenue J8, LLC

GUARANTOR: The CNA Royal Trust

## CONTINUING AND UNCONDITIONAL GUARANTY

To:    Bank of America, N.A.

1. **The Guaranty.** For valuable consideration, the undersigned ("Guarantor") hereby unconditionally guarantees and promises to pay promptly to Bank of America, N.A., its subsidiaries and affiliates (collectively, "Bank"), or order, in lawful money of the United States, any and all Indebtedness of Avenue J8, LLC ("Borrower") to Bank when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter. The liability of Guarantor under this Guaranty is not limited as to the principal amount of the Indebtedness guaranteed and includes, without limitation, liability for all interest, fees, indemnities (including, without limitation, hazardous waste indemnities), and other costs and expenses relating to or arising out of the Indebtedness and for all Swap Obligations now or hereafter owing from Borrower to Bank. The liability of Guarantor is continuing and relates to any Indebtedness, including that arising under successive transactions which shall either continue the Indebtedness or from time to time renew it after it has been satisfied. This Guaranty is cumulative and does not supersede any other outstanding guaranties, and the liability of Guarantor under this Guaranty is exclusive of Guarantor's liability under any other guaranties signed by Guarantor. If multiple individuals or entities sign this Guaranty, their obligations under this Guaranty shall be joint and several. If Guarantor is a subsidiary or affiliate of Borrower, Guarantor's liability hereunder shall not exceed at any one time the largest amount during the period commencing with Guarantor's execution of this Guaranty and thereafter that would not render Guarantor's obligations hereunder subject to avoidance under Section 548 of the Bankruptcy Code (Title 11, United States Code) or any comparable provisions of any applicable state law.

2. **Definitions.**

(a) "Bank Agreements" shall mean all agreements, documents, and instruments evidencing any of the Indebtedness, including but not limited to all loan agreements between Borrower and Bank and promissory notes from Borrower to Bank in favor of Bank, and all deeds of trust, mortgages, security agreements, and other agreements, documents, and instruments executed by Borrower in connection with the Indebtedness, all as now in effect and as hereafter amended, restated, renewed, or superseded.

(b) "Borrower" shall mean the individual or the entity named in Paragraph 1 of this Guaranty and, if more than one, then any one or more of them.

(c) "Guarantor" shall mean the individual or the entity signing this Guaranty and, if more than one, then any one or more of them.

(d) "Indebtedness" shall mean any and all debts, liabilities, and obligations of Borrower to Bank, now or hereafter existing, whether voluntary or involuntary and however arising, whether direct or indirect or acquired by Bank by assignment, succession, or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, held or to be held by Bank for its own account or as agent for another or others, whether Borrower may be liable individually or jointly with others, whether recovery upon such debts, liabilities, and obligations may be or hereafter

- 61 -

Continuing or Limited Guaranty

EXHIBIT  D

54

become barred by any statute of limitations, and whether such debts, liabilities, and obligations may be or hereafter become otherwise unenforceable. Indebtedness includes, without limitation, any and all Swap Obligations and any and all obligations of Borrower to Bank for reasonable attorneys' fees and all other costs and expenses incurred by Bank in the collection or enforcement of any debts, liabilities, and obligations of Borrower to Bank;

(e) "Swap Obligations" shall mean all obligations of Borrower arising under any interest rate, credit, commodity or equity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross currency rate swap, currency option, securities puts, calls, collars, options or forwards or any combination of, or option with respect to, these or similar transactions now or hereafter entered into between Borrower and Bank.

3. **Obligations Independent.** The obligations hereunder are independent of the obligations of Borrower or any other guarantor, and a separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or any other guarantor or whether Borrower or any other guarantor be joined in any such action or actions. Anyone executing this Guaranty shall be bound by its terms without regard to execution by anyone else.

4. **Rights of Bank.** Guarantor authorizes Bank, without notice or demand and without affecting its liability hereunder, from time to time to:

(a) renew, compromise, extend, accelerate, or otherwise change the time for payment, or otherwise change the terms, of the Indebtedness or any part thereof, including increase or decrease of the rate of interest thereon, or otherwise change the terms of any Bank Agreements;

(b) receive and hold security for the payment of this Guaranty or any Indebtedness and exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any such security;

(c) apply such security and direct the order or manner of sale thereof as Bank in its discretion may determine;

(d) release or substitute any Guarantor or any one or more of any endorsers or other guarantors of any of the Indebtedness; and

(e) permit the Indebtedness to exceed Guarantor's liability under this Guaranty, and Guarantor agrees that any amounts received by Bank from any source other than Guarantor shall be deemed to be applied first to any portion of the Indebtedness not guaranteed by Guarantor.

5. **Guaranty to be Absolute.** Guarantor agrees that until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated, Guarantor shall not be released by or because of the taking, or failure to take, any action that might in any manner or to any extent vary the risks of Guarantor under this Guaranty or that, but for this paragraph, might discharge or otherwise reduce, limit, or modify Guarantor's obligations under this Guaranty. Guarantor waives and surrenders any defense to any liability under this Guaranty based upon any such action, including but not limited to any action of Bank described in the immediately preceding paragraph of this Guaranty. It is the express intent of Guarantor that Guarantor's obligations under this Guaranty are and shall be absolute and unconditional .

6. **Guarantor's Waivers of Certain Rights and Certain Defenses.** Guarantor waives:

(a) any right to require Bank to proceed against Borrower, proceed against or exhaust any security for the Indebtedness, or pursue any other remedy in Bank's power whatsoever;

(b) any defense arising by reason of any disability or other defense of Borrower, or the cessation from any cause whatsoever of the liability of Borrower;

- 52 -

Continuing or Limited Guaranty

55